| 58 | 375 |
| 68 | 16 |
| 58 | 375 |
| 70 | 175 |
| 58 | 375 |
| 71 | 43 |
| 58 | 375 |
| 73 | 666 |

MARGARET B. TYLER *vs.* WILSON WADDINGHAM.

New Haven & Fairfield Cos., Oct. T., 1889. ANDREWS, C. J., CARPENTER, LOOMIS, PRENTICE and J. M. HALL, Js.

The defendant in 1881 authorized *K* to contract for the optional right to purchase lands on the shore of Long Island Sound, agreeing to furnish money for the purpose, it being their intention during the life of the options to organize a corporation to take the lands at an advanced price, the defendant to have two thirds and *K* one third of the profits. The defendant advanced several thousand dollars which was placed in a bank in the name of *K* as trustee. The plaintiff owned a large farm which was a part of the land embraced by their scheme, and *K* went to her and proposed to purchase it, stating that he was the agent of a company of which the defendant was the head, and upon his solicitation she signed a contract to convey the farm to *K* or his appointees on or before March 1, 1882, and *K* by it agreed to pay $50,000 for the land, which was afterwards reduced to $40,000 by agreement. In February, 1882, the conveyance was made to *K*, who paid $5,000 in money and gave two notes of $5,000 and $30,000 payable in one and ten years, and mortgaged back the land as security for them. The purchase was made by *K* without the authority of the defendant, who did not know of it until the summer of 1882, when, on being informed of it by *K*, he undertook with him to form a company to take the lands. The company was formed, and in October, 1882, *K*, at the defendant's request, deeded to it the lands in question and other lands purchased by him, and the company issued to him as paid-up stock all but five shares of its capital, $800,000, the defendant giving him a written statement

Tyler *v.* Waddingham.

that he was entitled to one third of the profits from the lands. After the defendant knew that *K* had obtained deeds of land in his own name, he continued to advance him money in aid of the enterprise and endeavored to induce others to become interested in the scheme for the development of the lands. Held that the relation of the defendant and *K* was that of partners.

But held that if the plaintiff, in conveying the farm to *K* and taking his notes in payment, had elected to give exclusive credit to him, she could not proceed against the defendant now.

But in all such cases the election must be made with full knowledge as to the relations of the parties between whom the choice is to be made.

And the rule requires actual knowledge as distinguished from constructive knowledge.

The two notes of *K* held by the plaintiff and secured by the mortgage were for $5,000, payable in one year, and for $30,000, payable in ten years, both with semi-annual interest. In October, 1883, when the first note was several months overdue, the defendant gave the plaintiff the following guaranty:—"In consideration that Mrs. M. B. T. has at my request agreed to forbear for two years from the present time to take any steps to collect by legal process the principal of the note of $5,000, dated Feb. 28th, 1882, signed by E. L. K., payable to her one year from date, with interest at six per cent per annum, payable semi-annually, unless requested by me to take such steps, I hereby guarantee the punctual payment of each and every instalment of interest on said note as they shall become due, and also of each and every instalment of interest that shall come due on the note of said K. for $30,000, payable ten years from date." Held that the guaranty was not limited to the two years for which forbearance of suit was agreed, but was a guaranty of the payment of the interest on both notes until the principal of both was paid.

This guaranty being absolute, no demand upon the maker of the notes was necessary before bringing suit upon it.

*K* having died the plaintiff presented the notes against his estate, which was in settlement as a solvent estate, but after the time for presenting claims had expired withdrew them. Held not to discharge the defendant from his liability on the guaranty.

The negotiations between the parties which resulted in the agreement to give the guaranty took place on Sunday, but the written guaranty was not executed until a secular day. Held not to be invalidated by the fact that the negotiations were on Sunday.

The court below made a finding in detail of sundry facts and then proceeded thus:—"Upon said finding I further find the second defense to the first count true," (that the plaintiff had elected to give exclusive credit to *K.*) Held to be a conclusion of law and not a finding upon evidence, and therefore reviewable upon error.

[Argued October 22d, 1889—decided February 7th, 1890.]

ACTION to recover the amount of a certain note overdue

and interest upon another note not yet due, upon a guaranty of the defendant; brought to the Superior Court in New Haven County, and tried to the court before *Fenn, J.* Facts found and judgment rendered for the plaintiff for $1,050. Both parties appealed. The case is fully stated in the opinion.

*S. E. Baldwin* and *T. H. Russell,* for the plaintiff.

*H. Stoddard* and *C. K. Bush,* with whom was *C. Kleiner,* for the defendant.

LOOMIS, J. The record in this case as it comes to this court is unnecessarily voluminous and complicated.

The complaint as first brought to the September session, 1887, of the Superior Court for New Haven County, was against three defendants, namely:—The West Shore Land Improvement Company, a New York corporation, having an office and doing business in Orange in this state; Edward A. Anketell of New Haven, as administrator of the estate of Edward L. Kimberly, late of said Orange, deceased; and Wilson Waddingham of said Orange; all of whom remained defendants until the 23d day of February, 1888.

Meanwhile sundry voluminous motions to strike out and expunge portions of the complaint were heard by the court and in part sustained. Also sundry demurrers by the defendants to the complaint for multifariousness and misjoinder of defendants were heard and sustained by the court. After which, on the date last mentioned, the plaintiff by written withdrawal signed by her attorney, and made part of the record, wholly discontinued the action against all the defendants mentioned except Waddingham, and filed a new complaint, called in the record the "second amended supplemental complaint," upon which the trial proceeded against Waddingham alone.

This complaint consisted of two counts. The first count sought to make Waddingham liable, either as unnamed principal or as a partner with Kimberly, to pay a note of five thousand dollars described in the complaint and given by

Kimberly on the purchase by him of certain real estate belonging to the plaintiff.

The second count was based upon an express contract by Waddingham as guarantor for the payment of the interest on the note for five thousand dollars, and also on another note for thirty thousand dollars given by Kimberly to the plaintiff on account of the purchase mentioned.

The court found for the defendant on the first count and for the plaintiff on the second, and both parties have appealed to this court.

The facts found by the court are in substance as follows :— In 1881 Kimberly entered into an agreement with the defendant Waddingham, by which the latter was to furnish money to procure options to purchase land (including the plaintiff's) on and near the shore of Long Island Sound in the towns of Orange and Milford, and then during the life of the options to organize a corporation to take the lands at an advanced price. Waddingham was to have two thirds and Kimberly one third of the profits, and the former agreed to advance to Kimberly, and did so, fifteen thousand dollars toward the accomplishment of said objects. The sums so advanced were to be and were deposited in a bank mutually agreed on, in the name of E. L. Kimberly, trustee. The defendant between the 6th day of September, 1881, and the 28th day of February, 1883, inclusive, at different times advanced to Kimberly in the aggregate the sum of forty-five thousand three hundred and fifty-nine dollars, of which five thousand dollars was paid back.

The plaintiff owned a large farm, as described in the complaint, which was a part of the land the agreement between Kimberly and the defendant had reference to. Kimberly at first went to the plaintiff accompanied by a real estate broker to negotiate for the purchase of her farm, but as they were not financially responsible she refused to negotiate with them until they announced themselves as agents, and gave her to understand they were agents of a company of which the defendant was the head. Afterwards, on the 6th of October, 1881, she entered into an agreement in writing signed

by her and Kimberly, by which she agreed to convey the land to Kimberly, or his appointees, on or before March 1st, 1882, and Kimberly on his part agreed to make payment and give security as specified in the agreement. The price first agreed to be paid for the farm was fifty thousand dollars, but afterwards, before the day for the giving of the deed, in February, 1882, by reason of Kimberly's representation made to the plaintiff that he would not be able to carry out the contract at the price first agreed, she reluctantly consented to reduce the purchase price to forty thousand dollars, and the agreement was so modified. In February, 1882, the conveyance was made to Kimberly, who made part payment in money out of the funds furnished by the defendant, and for the remainder of the purchase price executed and delivered to the plaintiff notes described in the complaint, and mortgaged the land so purchased as security for their payment to the plaintiff.

In fact the defendant did not authorize Kimberly to make any purchases of land or give notes and mortgages for such purchases, either in his name or in Kimberly's, or on account of either or both, except to the extent of the purchase of options. He was not aware that Kimberly had done more until the summer of 1882, when he was informed of the facts by Kimberly, who urged him to assist in the formation of a company, which the defendant consented to do, hoping thereby to get some of his money back.

On the 28th of October, 1882, Kimberly, at the request and solicitation of the defendant, deeded all the lands purchased by him, or the equities therein, to the West Haven Shore Land Improvement Company, and the company issued to him paid up capital stock to the amount of nearly eight hundred thousand dollars, being all except five shares of the capital of the company, in return for the lands; and the defendant gave Kimberly a writing stating that he was entitled to one third interest in the profits of the lands so conveyed by him.

The court also finds that, after the defendant knew that Kimberly had obtained deeds of land in his own name, he

continued to loan him money to assist him and endeavored
to induce others to become interested in the scheme for the
development of the lands, and tried to secure the construc-
tion of a railroad to benefit the property, but without suc-
cess. Kimberly paid the interest on the plaintiff's notes to
February 28th, 1883, inclusive; and the defendant paid it
from that time to August 28th, 1886, inclusive; and since
October 1st, 1886, the defendant has been in exclusive pos-
session and control of all the property in question, taking
all the rents and profits.

In reference to the seventh paragraph in the first count of
the plaintiff's complaint, which alleged that "the plaintiff
when she accepted said notes did not know of the nature of
the agreement between Kimberly and Waddingham, and
did not intend to release any claim against Waddingham,"
the finding is as follows:—

" The plaintiff testified in her deposition that when she
took these notes the only knowledge she had of the nature and
terms of any agreement then existing between Kimberly and
Waddingham, was that she 'understood they were only
agents for a land improvement society, of which Wadding-
ham was the head and formed the responsible party;' and
that she did not intend, by so doing, to release Waddingham
or any other person from any claim she might have against
him or them; and that in taking the notes and mortgages,
(she also took and holds a mortgage from Kimberly of a
one third interest in other property valued at $11,400 as
additional security for the $5,000 note,) she did not give
exclusive credit to Kimberly, and did not consider that she
in any way released any rights against Waddingham or any
company that might be liable to her. On the whole evi-
dence, however, I am of opinion, and find, that the sole
influence which the understanding and belief on the part of
the plaintiff that Kimberly was acting, not on his own sole and
unassisted responsibility, but upon that of Mr. Waddingham
or of some company formed or to be formed in which he
was interested, exerted over her, was that she was thereby
convinced that the scheme would be carried through and

the notes and mortgages discharged, but I do not find that when she accepted the notes and mortgages from Kimberly she had any understanding or belief that, apart from the security upon the real estate, there was any other individual or company personally bound or liable to her for the contract price or any part thereof."

The court also adds—" And upon said finding I further find the second defense to the first count true;" which defense was as follows:—

"1. The plaintiff elected to give, and did give, sole and exclusive credit to Kimberly in the transactions set up in the fifth and sixth paragraphs of said count.

"2. The plaintiff accepted in payment of the property described in plaintiff's exhibit *A*, the notes of Kimberly set up in paragraph six, secured by a first mortgage from Kimberly to the plaintiff upon the property.

"3. The plaintiff still holds and owns said mortgages."

The plaintiff, in support of her appeal, claims that the trial court erred in its rulings in four respects.

1. In sustaining the demurrer for misjoinder of parties and causes of action.

2. In holding that the relationship of partners or principal and agent did not exist between Kimberly and the defendant.

3. In allowing Bush, the attorney, the privilege of counsel in refusing to answer certain inquiries.

4. In striking out certain paragraphs from the amended supplemental complaint.

In regard to the questions as to misjoinder, they are not properly before this court for review, for the reason that the plaintiff withdrew her case against the West Haven Shore Land Improvement Company and against the administrator of Kimberly, and filed a new complaint against the present defendant alone. The action was discontinued against the other two parties, so that it was no longer in the Superior Court, and therefore it could not be appealed from that court to this court. The motives for withdrawal are of no consequence. It is equally immaterial whether it was be-

cause the plaintiff thought she had no case, or because she knew the court thought so. In contemplation of law the case was taken out of court by the voluntary action of the plaintiff, and placed beyond the reach of all courts, unless upon some appropriate proceeding for its reinstatement.

We come next to the question whether upon the facts contained in the finding the relation of partners, or of principal and agent, existed between Kimberly and the defendant, so that the debts contracted by Kimberly in dealing with the plaintiff were the debts also of the defendant. The form of the question implies not only that the true answer to be given is in doubt, but that the relation of the parties must be either that of principal and agent or copartners.

We discover very few indications of ordinary agency. In the light of the few facts given it is extremely difficult to point out the principal who is to command or the servant who is to obey. Although Kimberly invented the scheme and first proposed it to Waddingham, and the form of proposal at first indicated that all that was expected of Waddingham was to furnish him money for a consideration, yet, as finally launched, it entirely loses the appearance of being Kimberly's sole enterprise, and he no longer seems a mere borrower of money from Waddingham, who is to receive two thirds of the profits in lieu of interest; for Kimberly's receipt, which the court finds was executed at the same time as a part of the transaction, shows that the money so furnished was "to be deposited in a bank agreed upon, to his credit as trustee, for the purpose of making contracts for land," etc., and the writing concludes—"following is the interest *each party shares in the profits.*" Then after the signature and date there was added—"The profits from the above investment are to be divided as follows:—One third to E. L. Kimberly; two thirds to Wilson Waddingham & Co. (signed) E. L. Kimberly." Thus showing, if not directly, by necessary inference, that there were two equal parties, regarded as principals, each of whom was a sharer in the profits, and that there was a common investment, a common adventure on the joint account of the two concerned, with a definite agreement as to the division of the profits.

It is true that Kimberly was not at first expressly author-
ized to take deeds in his own name and give his own notes,
and that the scheme as first proposed contemplated the pur-
chase of options to obtain the land and afterwards selling
the same at an advance to a corporation to be formed for the
purpose of purchasing it. But after the defendant knew all
the facts as to Kimberly's transactions, he immediately ac-
cepted all the benefits, continued to furnish money to effec-
tuate the common object, was active in promoting schemes
for the development of the property and the enhancement
of its value, procured, or assisted in procuring, the forma-
tion of a corporation as contemplated, and induced Kimberly
to convey the land in question and other lands purchased in
the same way to the corporation, at the enormous valuation
of eight hundred thousand dollars, for which stock was issued
to Kimberly nominally representing that sum. And imme-
diately upon the consummation of all these transactions the
defendant wrote to Kimberly as follows:—

"WEST HAVEN, CONN., Oct. 30, 1882.
" E. L. KIMBERLY, Esq.,

" In reply to your inquiries, I beg to state that you are
entitled to one third interest of the profits of all the lands
purchased by you and this day deeded by you to the West
Shore Land Improvement Company. Yours sincerely,

" WILSON WADDINGHAM."

In the light of all these facts will not the law recognize
the features of a partnership, especially in behalf of a third
person?

Let us ascertain and apply the sharpest and most approved
legal tests of this relation. In *Loomis* v. *Marsh*, 12 Conn.,
69, this court said:—" The test of partnership is a commu-
nity of profit, a specific interest in the profits as profits, in
contradistinction to a stipulated portion of the profits as a
compensation for services." Smith, in his Mercantile Law,
p. 26, says:—" To constitute such a community of profit as
is requisite to a partnership, the partner must not only share
in the profits of his companions, but share in them as a
principal; that is, he must not be a mere agent, factor or

servant, receiving in lieu of wages a sum proportional to the profit gained by his employers. Still, if a servant or agent stipulate for a share in the profits and so entitles himself to an account of them, he becomes as to third persons a partner." Parsons, in his treatise on Partnership (2d ed., p. 149,) says:—" We should hold the test of partnership to be * * * has the party lending or contributing the money acquired by his bargain a proprietary interest in the profits while they remain undivided? If he has, he is liable as a partner; otherwise he is not so liable." In 3 Kent's Commentaries, p. 22, note *a*, it is said:—" It is not essential to a partnership that there should be a communion of interest in the capital stock and also in the profit and loss. If there be a community of profit, or of profit and loss, in the adventure or business between the parties, they will be partners in the profit and loss, though not partners in the capital stock. If, however, there be no agreement between the parties on the point, the presumption will be a community of interest in the property as well as in the profit and loss. * * * There is also a distinction between a stipulation for a compensation for labor proportioned to the profits, without any specific lien upon such profits, and which does not make a person a partner, and a stipulation for an interest in such profits, which entitles the party to an account as a partner." This Chancellor WALWORTH, in *Champion* v. *Bostwick*, 18 Wend., 185, and Mr. Justice WILDE, in *Denny* v. *Cabot*, 6 Met., 82, held to be a sound distinction as regards the rights of third persons.

In all these citations we may recognize one and the same test—a proprietary interest in the profits while they remain a part of the undivided stock; and we ask, after Kimberly had sold the lands in question, could not Waddingham have maintained an action of account against him to have their relative rights in the avails of the sale adjusted, or must he content himself with an action at law for the use of money? Could he not even have followed the profits into the common reservoir created by the parties to receive them,—namely, this corporation, to which the lands were sold, and

have the stock of the corporation distributed according to
their respective proprietary interests in the profits? Or, on
the other hand, if the corporation had issued to Wadding-
ham all the stock which represented the value of the lands
sold, could not Kimberly have maintained account to deter-
mine his interest, or must he have simply sued Waddingham
for his services?

It is now well established that there may be a partnership
to trade in land. *Brady* v. *Calhoun*, 1 Penrose & Watts,
140; *Morse* v. *Richmond*, 97 Ill., 303; *Heulett* v. *Fairbanks*,
40 Ohio St., 232; *Dale* v. *Hamilton*, 5 Hare, 369.

In *Richards* v. *Grinnell*, 63 Iowa, 44, by an oral agree-
ment *A* was to furnish money with which *B* was to buy
land, taking the title in *A's* name. *A* was to receive for his
capital ten per cent interest and half the profits from the
sale of the land. *A* brought an action of account against
*B*, which was sustained on the ground that *A* and *B* were
partners. In *Hill* v. *Sheibley*, 68 Geo., 556, *B* received the
money of *A*, to be invested on joint account in buying land.
If no investment should be made the money was to be re-
turned. *A* died and his administrator sued *B* and obtained
a verdict, which the higher court set aside on the ground
that *B* was not a trustee or agent, but a partner of *A*.

If then we have established the position that Wadding-
ham and Kimberly were partners, there being no question
that the contracts for the purchase of the plaintiff's land
and the notes given in payment therefor were strictly in
pursuance of the purpose and business of the partnership,
the liability of Waddingham, *primâ facie*, is established in
favor of the plaintiff. But this *primâ facie* liability, based
on the presumption that all the partners are equally liable
for the obligations of the copartnership, may be rebutted by
direct evidence that the credit was not given to the partner-
ship, but to an individual member of it. *Smith* v. *Watson*,
2 Barn. & Cress., 401; *Ensign* v. *Hands*, 1 Johns. Cases, 171.

If then the finding shows that the plaintiff elected to
give exclusive credit to Kimberly at the time of the making
of the contract in question, she cannot proceed against the

defendant now. The counsel for the defendant claims that this point is settled as a question of fact by the finding of the court that the second defense to the first count is true, which presents this precise issue. This claim would be un-answerable if intended to be so found as a question of fact based on appropriate evidence before the court. But it is to be noticed that this is at the conclusion of what the court calls its special finding of facts, and the court in terms says—"And upon said" (special) "finding I further find the second defense to the first count true." It was not therefore intended as a finding of a fact based on inde-pendent evidence, but only as an application of the special facts previously stated to the determination of the legal issue raised by the second defense. The question is there-fore controlled by the special facts referred to and the legal conclusions to be drawn therefrom.

Such a finding was held reviewable in *Mead* v. *Noyes*, 44 Conn., 487; and in *Hayden* v. *Allyn*, 55 Conn., 280, this point was even more fully considered. The finding there concluded—"Upon the facts set forth it is found that said transfer was not made in good faith in the regular course of business, and was made in view of insolvency and with in-tent to prefer a creditor, the defendant company." In regard to which we then said—"If this had been a conclu-sion of fact from the evidence before the court it could not be reviewed; but it is very clearly an inference of law from the facts specifically found. The evidence had exhausted itself in producing the facts thus found. Nothing remained but for the court in the exercise of its legal judgment to draw its inference from the facts. This the judge himself distinctly states in saying that this conclusion is upon the facts set forth. In such a case the conclusion of the court can always be reviewed by the appellate court. An erro-neous conclusion is an error of law and not an error in an inference of fact."

The question then for review in the case at bar is, whether the conclusion of the court that the plaintiff had elected to

give exclusive credit to Kimberly was warranted by the special facts found.

It seems to us that these facts, when examined in the light of well-established legal principles, will be found to lack at least one essential element of a binding election, which is, full knowledge as to the relation of the parties between whom the choice is to be made. If we reason merely from the nature of the act the necessity of such knowledge would be implied, for without it it would be impossible to make a selection from two or more persons. But however this may be, no rule of law is better established than this. Parsons, in his treatise on Partnership, 2d ed., p. 110, says, speaking of the effect of giving credit to one partner alone: —" It must however be remembered that this credit, to exonerate the other partners, must be given knowingly and voluntarily. For if one sold goods actually to a firm, but through the agency of a partner whom he did not know to be a partner, and accordingly charged the same to that partner alone, the firm would still be bound. We think this rule applies equally to all simple contracts, whether oral or written."

The rule applicable to an after-disclosed partner is identical with that as to an after-disclosed principal. In *Merrill* v. *Kenyon*, 48 Conn., 314, this court insisted upon the necessity of full and actual knowledge in order to debar a seller of goods to an agent from his right to make the principal his debtor on discovering him, and held that where the seller took the promissory note of the buyer for the goods, with knowledge that he was an agent, but without knowing who the principal was, he was not thereby debarred from afterwards electing to make the principal his debtor.

The knowledge which the plaintiff possessed, as found by the court, falls far short of the full measure required by law. It is found that the plaintiff testified that she understood Kimberly to be only agent of a land improvement society, of which Waddingham was the head and formed the responsible party, but she did not intend to give exclusive credit to Kimberly, nor release rights she might have

against Waddingham or any company that might be responsible to her. The court however in effect found on the whole evidence that her belief was that Waddingham was not legally holden, but that his connection with an interested company was such that the scheme would be carried out, but at the same time she had no idea that any other individual or company was personally bound to pay her for the land.

If it be suggested that the mention of Waddingham as having some influential connection with the matter was sufficient to put the plaintiff on inquiry and give her the means of knowledge, we reply that the rule requires actual knowledge in contradistinction to that which is constructive, and full knowledge in contradistinction to that which is partial. *Thompson* v. *Davenport*, 9 Barn. & Cress., 78; *Raymond* v. *Crown & Eagle Mills*, 2 Met., 319. Both these cases are cited with approval in *Merrill* v. *Kenyon, supra.*

It will not suffice to disclose the name of one who was in fact partner or principal unless his true position as such be also disclosed. There seems to have been an utter misconception on the part of the plaintiff of the true position of Waddingham relative to the case; and furthermore there was one material fact that it was impossible for her to know at the time she took the notes of Kimberly, namely, that Waddingham would ratify, as he did in the summer of 1882, the unauthorized act of Kimberly in making an absolute purchase of land instead of buying mere options to purchase, as the agreement first made contemplated.

We do not know, and there is nothing to suggest, how this fact was met or disposed of in the court below, or whether it was considered at all in this connection. The form of the special finding, that when the plaintiff accepted the notes and mortgages she had no belief that there was any other person or company liable to her, indicates that it may have been assumed on the trial that the true and conclusive test of the question whether exclusive credit was given to Kimberly, was the actual intent and belief of the plaintiff at the time, irrespective of her knowledge of the ma-

terial facts. We have already seen that what the law deems giving exclusive credit, may be very different from the actual belief of the party at the time. All the numerous cases where a vendor has been permitted to resort to an after-discovered partner or principal, are founded on this distinction, and the phrase " after-discovered " implies it.

There is no fact found showing when the plaintiff first knew of the defendant's actual connection with this matter, or what she did after that date in the way of giving credit to Kimberly. There is a suggestion of the possible existence of facts bearing upon this point in the allegations of the second defense to the second count, which was demurred to by the plaintiff and the demurrer sustained. A demurrer admits facts that are well pleaded, but only for the purpose of determining their legal sufficiency. Facts so admitted are not admitted for the purposes of evidence at all, and therefore can have no bearing upon the questions referred to. *Pease* v. *Pease*, 10 Conn., 68; *Gray* v. *Finch*, 23 Conn., 495; *Havens* v. *Hartford & New Haven R. R. Co.*, 28 Conn., 90; Gould's Pleading, 461, 462.

As this part of the case which we have been considering may not have been fully investigated in the trial court and as the record suggests the possibility of other evidence in the case, we prefer to grant a new trial of this issue rather than to reverse the judgment.

The alleged errors, predicated upon the striking out by the court of certain paragraphs in the amended supplemental complaint, inserted originally as the plaintiff claims to lay the foundation for showing the relation between Waddingham and the West Haven Shore Land Improvement Company, and between Waddingham and Kimberly, have all been rendered immaterial, partly in consequence of the voluntary withdrawal of the action against two of the parties, and partly in consequence of the construction we have placed on the finding of the court that Kimberly and the defendant were partners in the transaction.

This last mentioned fact also renders it immaterial to discuss the question whether Mr. Bush, the counsel for the

defendant and for the West Haven Shore Land Improvement Company, was properly excused from answering the questions put to him by the plaintiff, upon the ground of his professional privilege. The utmost result which the plaintiff claimed from the evidence desired was to establish the partnership between Kimberly and the defendant and that the corporation was duly organized under the laws of the state of New York; facts already established upon our construction of the finding.

This brings us to the consideration of the questions arising upon the defendant's appeal under the second count of the complaint, which predicates his liability solely upon a written guaranty signed by him, as follows:—

"In consideration that Mrs. Margaret B. Tyler, of Springfield, Massachusetts, has at my request agreed to forbear for a period of two years from the present time to take any steps to collect by legal process the principal of the note of $5,000, dated February 28th, 1882, signed by Edward L. Kimberly, payable to said Margaret B. Tyler one year from date, with interest at the rate of six per cent per annum, payable semi-annually, together with all taxes assessed upon said sum against said Tyler, or the holder of the note, unless requested by me to take such steps; I hereby guarantee the punctual payment of each and every instalment of interest on said note as they shall become due, and also of each and every instalment of interest that shall come due on the note of said Kimberly for $30,000, payable ten years from date, but otherwise of the same date and tenor as said first mentioned note. Dated at New Haven, October 2d, 1883. (Signed) WILSON WADDINGHAM."

The construction of this contract and the extent of obligation it imposed on the defendant, is the important question raised by this appeal.

There was a counter-claim filed by the defendant for the reformation of this contract, and the court has found in detail the verbal negotiations of the parties that preceded the execution of the writing, as follows:—

"On Sunday, September 23d, 1883, Mr. Russell, acting

for Mrs. Tyler, called on Mr. Waddingham at his residence in West Haven, introduced himself, and stated that he called in reference to the Tyler matter. He mentioned the $5,000 note, which was then overdue, and also instalments of interest overdue on both notes, saying further that Mrs. Tyler, while she had considerable property, was land-poor, so to speak; she had her children to support, and she needed her interest; she must have it; she depended upon it. Mr. Waddingham said—'That matter will be all right. You need have no trouble about it,' adding—'I will give you a check for the interest now.' Mr. Russell stated that he did not care to receive that then; he would prefer to wait until some arrangement could be made about the whole matter. As Mr. Waddingham had friends to dinner he excused himself, asking Mr. Russell to come again the following Sunday. Mr. Russell did so. At this interview Mr. Russell told Mr. Waddingham that he had looked into the matter to some extent, and as far as he could see there was a good chance of holding him liable as a partner on these notes. Mr. Waddingham said there was no such chance at all, that there was no such thing, but that he had advanced or loaned Kimberly a very large sum of money, and now proposed to go through with the scheme in some form. After more conversation Mr. Russell finally said that if the interest was guaranteed he would be satisfied, and that he would prepare a form of guarantee and send it to Mr. Waddingham for signature. To this Mr. Waddingham agreed. Nothing was said about the time of extension, or directly as to length of time of guarantee, during their interview. The entire substance of the interview is hereinbefore recited. On October 1st, 1883, Mr. Russell sent the guarantee recited in paragraph 2 of said count to Mr. Waddingham, accompanied by the following note:—

'NEW HAVEN, CONN., Oct. 1, 1883.

' WILSON WADDINGHAM, Esq., Dear Sir:—The amount of the interest on the Tyler notes, due September 1st, 1883, is $1,050, being six months interest at six per cent on $35,000. I inclose form of guarantee for your signature, drawn to

correspond with the oral understanding already arrived at. Yours very respectfully,        TALCOTT H. RUSSELL.'

To which Mr. Waddingham, having signed and inclosed the guarantee, replied as follows:—

'NEW YORK, Oct. 2d, 1883.

'TALCOTT H. RUSSELL, Esq., Dear Sir:—Your esteemed favor of first instant duly received, and inclosed herewith I hand you my No. A. 180 check on the Wall Street National Bank, this city, for $1,050, in accordance with our understanding, and also inclose herewith the guarantee, with my signature attached, which you desire me to send. Very truly yours, WILSON WADDINGHAM, per C. F. MADISON.'

This constitutes the entire negotiations in reference to said guarantee."

This evidence was pertinent to the issue upon the defendant's counter-claim for a reformation of the contract, but it failed to establish the facts necessary to grant the relief prayed for, and it was properly denied by the court, and no error is alleged in this respect. But the facts as to the verbal negotiations of the parties resulting in the written contract have been referred to by counsel on both sides as having some bearing upon the question as to the construction of the written contract. Some of the facts may have a remote bearing upon this question, still in our judgment there appears no such ambiguity in the language of the contract as to give any controlling importance to any of the extrinsic facts of the case.

The plaintiff claims that the agreement is a guarantee of the interest upon both of the notes mentioned until the principal shall be paid. The defendant, on the other hand, claims that he is not liable to pay interest on either note for a longer period than the expiration of the extension on the five thousand dollar note, to wit, October 2d, 1885; or for such time prior to that date as the defendant should cause such note to mature, by calling upon the plaintiff to collect it.

The main argument in support of the defendant's contention is founded upon the fact that the contract states the

consideration as confined simply to the five thousand dollar note and the forbearance to collect that note for two years unless requested by the defendant. It is claimed to be incredible that a man of wealth, for the mere purpose of securing a two years extension on a five thousand dollar note, would have knowingly bound himself to pay, in addition to the interest on that note, the interest also as it might come due on the thirty thousand dollar note that had nine years longer to run.

If the consideration named was the only thing that moved the defendant to his undertaking, the argument would have great force. But in drawing up the written agreement the statement of the consideration was immaterial, except that a good consideration must appear. It is to be noticed that in the verbal negotiations nothing was said as to consideration. We know from the extrinsic facts found by the court that there was another motive at this time operating on the mind of the defendant. It was his intention then to pay these notes in full, or, as he expressed it to Mr. Russell, he had advanced so much money already that he then proposed to go through the scheme in some form.

But if we knew nothing of the defendant's motives except as indicated in the statement of the consideration, it is absolutely certain that his guaranty was not confined to the five thousand dollar note, but embraced also the thirty thousand dollar note. But the defendant contends that as the smaller note was only extended two years the guaranty for the payment of the interest on that note was by implication limited to that time, and if so, that all the expressions relative to paying interest on the large note are to be controlled and limited by the expressions in regard to the first mentioned note, in the absence of other distinguishing words.

This reasoning might well apply were the language of the contract vague and ambiguous. But the undertaking of the defendant is here expressed with unusual clearness. It is to pay the future interest on two notes described and precisely identified, and all the future interest that may thereafter accrue is included. It would seem impossible to

mistake the meaning and application of the words—" punctual payment of each and every instalment of interest on said note as the same shall become due," " and also of each and every instalment of interest that shall come due on the note of said Kimberly for $30,000, payable ten years from date." In order to test what is within the scope of this contract it would seem absurd to ask whether the instalment had become due within two years, when each and every instalment coming due in the future is in terms included.

But the further claim is made that the contract only requires the defendant to pay the *interest;* and that after the five thousand dollar note became due there was no legal liability on any one to pay interest as such, but only damages for the detention of the principal. This obviously is not the case for any such distinction, for it is demonstrable that the parties did not use the term in this extremely technical sense. The five thousand dollar note became due February 28th, 1883, while the contract of guaranty was not executed till October 2d, 1883. The former therefore had been seven months overdue when the defendant agreed to pay each and every instalment of interest as it should become due. The fact that the plaintiff had agreed not to collect the note for two years, did not change damages for the detention of money back into interest for that time ; leaving it to change again into damages when the time expired.

We would not however rest the argument upon this narrow view. If neither note had been due when the contract in question was made we should still think that such a distinction was never contemplated by the parties, but that interest, as such, would be recoverable on the notes according to their terms as long as they remained outstanding and unpaid, although the principal might be overdue. *Hubbard* v. *Callahan,* 42 Conn., 528.

The defendant claimed upon the trial that the contract of guaranty was illegal and void because it was made upon Sunday, upon which the court makes the following finding: —" Although the preliminary oral discussions took place on

two several Sundays, as duly appears, I do not find that
the agreement was made or executed on Sunday." The
defendant contends that this is not equivalent to a finding
that it was not made on Sunday, and that as all the facts
appear this court may determine the question as matter of
law. Assuming for the purposes of this case that this posi-
tion is correct, it is certain from the finding that the written
guaranty was not executed or delivered on Sunday. It is
an undertaking to answer for the debt of another, and to
be binding it must be in writing under the statute of frauds.
The parol negotiations therefore which took place on Sun-
day could not under the statute amount to a completed and
binding agreement. The only binding contract in this case
was made on a secular day. The plaintiff was under no
necessity of proving, as part of her cause of action, her
own or her agent's illegal desecration of the Sabbath. Her
case began with the execution and delivery of the written
contract, and that was perfectly valid. *Frost* v. *Plumb*, 40
Conn., 111.

The mere fact that a contract grows out of a transaction
which took place on Sunday will not render it void. *Stack-
pole* v. *Symonds*, 3 Foster, 229; *Adams* v. *Gay*, 19 Verm., 358;
*Goss* v. *Whiting*, 24 id., 187; *Butler* v. *Lee*, 11 Ala., 885.
Where a horse was bought (by parol) on Sunday, but was not
delivered until Monday, it was held a valid sale, because the
sale was not made binding on Sunday under the statute of
frauds. *Blexsome* v. *Williams*, 3 Barn. & Cress., 232; *Wil-
liams* v. *Paul*, 6 Bing., 653; *Lovejoy* v. *Whipple*, 18 Verm.,
379. A deed signed and acknowledged on Sunday, but not
delivered till Monday, has been held good, upon the ground
that it could only take effect from delivery. *Love* v. *Wells*,
25 Ind., 503; *Bertenman's Appeal*, 55 Penn. St., 183; *Flan-
nagan* v. *Meyer*, 41 Ala., 132. So a note signed upon Sun-
day but delivered on a secular day has been held valid.
*Hilton* v. *Holton*, 35 Maine, 143; *Clough* v. *Davis*, 9 N.
Hamp., 500; *Hill* v. *Dunham*, 7 Gray, 543.

The defendant's claim that a demand of the maker of
these notes was necessary as a condition precedent to the

maintenance of this action against the guarantor, was pro-
perly overruled by the court. The guaranty was absolute
and not conditional within the decisions of this court.
*City Bank* v. *Hopson,* 53 Conn., 454; *Breed* v. *Hillhoause,*
7 Conn., 523.

The judgment is also claimed to be erroneous in amount,
in that the court made a mistake in computing the interest
at \$1,050, when it should have been only \$1,038$\frac{50}{100}$. The
only color for such a claim is found in the last date given in
the statement that the court gives "damages to the amount
of the interest on both notes from said 28th day of August,
1886, accruing prior to the date of the commencement of
this suit, namely, interest to February 26th, 1887, amount-
ing to \$1,050." The only mistake was in giving the date
under the videlicit as February 26th, instead of February
28th. There was in fact no mistake in the amount of in-
terest found due. The record shows that there was six
months interest due February 28th, 1887, upon thirty-five
thousand dollars, which amounts to the precise sum for
which the court rendered judgment. It will be noticed
that the suit was not commenced till July 26th, 1887, so
that the six months interest had been overdue about five
months.

The rulings of the court relative to the form of the ques-
tions to be put to Mr. Bush, one of the defendant's counsel,
respecting his taking possession of the land in controversy,
were fairly within the discretion of the presiding judge.
The defendant was allowed to question the witness fully as
to the circumstances under which possession was taken, and
was only interfered with when it was obvious that the skill-
fully framed questions were designed to call out certain
facts and exclude others connected with the same transac-
tion. The counsel confessed finally that if he could not
confine the witness exclusively to the arrangement had with
Mr. Russell, he did not care to inquire at all.

The excluded questions relative to the talk between Rus-
sell and Bush as to the meaning of the guaranty, and the
self-serving declarations of Waddingham relative to his

contract, if admitted, could not properly have affected the legal construction of the written contract, which was unambiguous in its terms as we have seen.

The testimony of Scott offered by the plaintiff "to matters" (as the finding states) "material to the claimed liability of Waddingham under the second count," must have been as to some extrinsic circumstances favorable to the plaintiff's construction of the contract. Counsel for the defendant in their brief say in effect that such was the object of this testimony. But our construction of the contract is based entirely upon the language of the contract itself, which is so clear in its meaning that no extrinsic evidence can vary it. The exclusion therefore of a question designed only to show the bias of the witness, who had already been, as it would seem, effectually impeached by record evidence, could not have materially affected the defendant.

It is also assigned as error that the court sustained the demurrer to the second defense to the second count. The allegations of that defense were:—1st. That on the day , 1887, Edward A. Anketell was duly appointed administrator on the estate of said Edward L. Kimberly, deceased, by the court of probate for the district of New Haven. 2d. That on or about the day of , 1887, the plaintiff duly presented said notes for payment to Edward A. Anketell, as such administrator, and claimed the payment of the same from said estate. 3d. That on or about the 20th day of January, 1888, and after the time limited for the presentation of claims had expired, the plaintiff withdrew all claims against said estate for the payment of said notes or either of them or the interest thereon. 4th. That the estate of said Kimberly was finally settled by said administrator on the 26th day of January, 1888, as a solvent estate.

It is too manifest to require discussion that the demurrer to this defense was properly sustained. These acts of the plaintiff could not have injuriously affected the defendant. As the plaintiff was not obliged to present her claim she had the right also either to withhold it or withdraw it. In

order to discharge a surety there must be a release of "some mortgage, pledge or lien—some right or interest in property which the creditor can hold in trust for the surety and to which the surety if he pay the debt can be subrogated, and the right to apply or hold must exist and be absolute." *Glazier* v. *Douglass*, 32 Conn., 393.

We find no error upon the defendant's appeal, and the judgment in favor of the plaintiff upon the second count is affirmed.

There was error upon the plaintiff's appeal, and a new trial is granted under the first count, upon the issue whether the plaintiff knowingly elected to take Kimberly as her sole. debtor for the payment of the price of the land.

In this opinion the other judges concurred.