Alice H. Greenleaf and Ida Greenleaf, Executrices, Defendants in Error, v. Jacob Feinberg, William Lorimer, Adolph J. Sabath, Frances Loeffler, Executrix, and Mamie Murphy, Executrix, Plaintiffs in Error.

## Gen. No. 22,246.

1. MORTGAGES, § 477*—*when history of partnership need not be set forth in bill for foreclosure.* Where the recitations in an amended and supplemental bill in foreclosure against certain defendants as members of a syndicate or partnership alleged that such defendants, members of the original partnership, held the title and executed the notes and trust deed under a stated name and style, it is not necessary that they give in detail a history of the proceedings of the syndicate or partnership.

2. MORTGAGES, § 477*—*what is necessary to set forth in bill to foreclose.* In a bill to foreclose, the elements which it is important to set forth are the notes, the trust deed, default and parties, and, even though an accounting is prayed, it is not necessary to anticipate the items and set them out in the pleading.

3. PARTNERSHIP, § 59*—*right to adopt individual name of partner.* A partnership may adopt the individual name of one of its members as the name under which it will do business.

4. PARTNERSHIP, § 133*—*when members jointly and severally liable on trust deed and note.* Where several individuals agree

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

together that they will buy a certain piece of property, take title thereto in the name of one of their number for the benefit of all, subdivide the property and handle it on a prearranged plan for their mutual profit, and such agreement is carried out and notes and a trust deed for the purchase price are signed in the name agreed upon, the parties to the agreement constitute a partnership and are liable jointly and severally on the deed and notes, even though the deed is under seal.

5. PARTNERSHIP, § 223*—*when members may not claim as defense that notes and trust deed are not signed by them.* Where notes for the purchase price of realty and a trust deed securing them are signed by one member. of a partnership on behalf of the other members with their consent and they ratify his act, they cannot set up as a defense that the instruments were not signed by them and that the Statute of Frauds therefore relieves them.

6. PARTNERSHIP, § 246*—*when parol evidence admissible to show act of.* Parol evidence is admissible to show that notes and a trust deed securing them, though signed in the name of an individual, were in fact the act of a partnership of which he is a member.

7. PARTNERSHIP, § 125*—*when evidence shows ratification of execution and delivery of notes and trust deed by one subsequently becoming partner.* In an action to hold certain persons liable as partners on notes and a trust deed executed by one of them, evidence *held* to show that the purchaser of the interest of one of the parties after the formation of the original agreement became a partner, participated in the transactions of the partnership and ratified the execution and delivery of the instruments.

8. WITNESSES—*when evidence of partner as to conversations with deceased partner is admissible.* Under J. & A. ¶ 5521, evidence of one of several partners of conversations had with a deceased partner in the presence of other partners is admissible against the executor of such deceased partner.

9. BILLS AND NOTES—*when release of one obligor does not release co-obligors.* An "indirect understanding" that a deficiency decree to be obtained in the future in a pending suit will not be "enforced or pushed" against one of the obligors of the notes and trust deed in suit is not such a release as will release also his co-obligors.

10. PARTNERSHIP, § 133*—*when members bound by act of member signing trust deed and notes for taxes, assessments and expenses of foreclosure.* The provisions and terms of a trust deed, signed by one member of a partnership in his own name but for the partnership, rendering the grantor of the deed liable for taxes, assessments, cost of foreclosure and solicitor's fees, bind the members of the partnership and are properly included in the decree on foreclosure.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Greenleaf et al. v. Feinberg et al., 210 Ill. App. 271.

Error to the Circuit Court of Cook county; the Hon. OSCAR E. HEARD, Judge, presiding.   Heard in the Branch Appellate Court at the October term, 1917.   Affirmed.   Opinion filed April 24, 1918.

CHARLES B. STAFFORD, for plaintiff in error Adolph J. Sabath.

SIDNEY S. POLLACK and BENJAMIN LEVERING, for plaintiff in error Frances Loeffler.

HARPER E. OSBORN, for defendants in error.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

The writ of error in this cause brings here for review a record of certain foreclosure proceedings which were prosecuted in the Circuit Court.   The decree which was entered provided, not only for a foreclosure of certain real estate, but for a deficiency decree in the sum of $54,223.80, against, amongst others, the plaintiffs in error, Adolph J. Sabath and Frances Loeffler, executrix of the estate of William Loeffler, deceased.

The original bill of complaint was filed on October 19, 1905.   After various proceedings, among them an amended bill of complaint, the defendants in error, Alice H. Greenleaf and Ida Greenleaf, as executrices of the last will and testament of Sarah A. Greenleaf, deceased, on December 14, 1910, filed an amended and supplemental bill of complaint.   That pleading alleged, among other things, that on or about September 1, 1892, Jacob Feinberg, William Loeffler, William Lorimer, William J. Murphy, John F. Dorman, Adolph J. Sabath and Charles H. Bromann, being indebted in the sum of $90,000, executed and delivered five promissory notes each for $18,000, payable in 2, 3, 4, 5 and 6 years after date, with interest at 6 per cent. payable semiannually; that said notes were executed by them under the name and style of Charles H. Bromann: that to secure said notes and interest they gave a trust

deed, dated September 1, 1892, recorded October 3, 1892, of a certain 30 acres of real estate in the City of Chicago; that the trust deed provided, in addition to certain conventional recitations, "that, whereas said grantors were about to subdivide the above described real estate into 272 lots, it was agreed that when said subdivision should have been made" they would be entitled to have, from time to time, two or more lots released from the lien of said trust deed, on payment of certain sums of money provided for in a schedule attached to the trust deed; that the above-named seven persons "held the title to said premises" under the name and style of Charles H. Bromann, and that they executed said trust deed under the name and style of Charles H. Bromann; that default has been made as to a large part of the principal indebtedness and certain interest; that the premises described in the trust deed were afterwards subdivided into 8 blocks containing 272 lots and "that said subdivision is commonly known as 'Kedzie Avenue Land Association Subdivision'"; that certain lots have been released, and that certain others, which are set forth, remain unreleased from the lien of said trust deed. The prayer was for foreclosure, an accounting, a deficiency decree, and for general relief.

Certain demurrers were filed to the amended and supplemental bill and all were overruled. Owing to the property being subdivided and many lots, from time to time, being sold and conveyed, the defendants to the amended and supplemental bill of complaint numbered between seven and eight hundred.

The defendants Jacob Feinberg, Frances Loeffler, executrix, etc., William Loeffler having died June 22, 1909, William Lorimer, Adolph J. Sabath and William J. Murphy, duly filed their answers, and the defendants John F. Dorman and Charles H. Bromann, being nonresidents, service was had upon them by publication and a copy of the bill. They, however, failed to

enter an appearance. After appropriate defaults and filing of replications, the cause was referred to a master in chancery to take testimony and report the same, together with his conclusions as to the law and the facts. Evidence was introduced on behalf of the complainants but none was offered on the part of the defendants except as to the condition of the Loeffler estate.

The master made his report recommending the relief prayed for by the complainants, and upon the exceptions thereto being overruled by the chancellor, it was, on May 11, 1915, confirmed and the property ordered sold. The decree found that there was due to the complainants $57,649.40, with interest from July 9, 1914, and costs. It also provided for the sale of the property and that, in case the receipts arising from the sale should be insufficient, the complainants should have execution for the balance, against, among others, the plaintiffs in error. The property was sold on June 30, 1915, and on November 1, 1915, a deficiency decree in the sum of $54,223.80, was entered against, among others, Adolph J. Sabath and Frances Loeffler, as executrix, etc. From that decree this appeal is taken.

Some time in the latter part of April, 1892, one Dorman, a defendant, who was associated in business with the defendant Bromann, presented to Bromann a proposition made to him by the defendants William Lorimer and William J. Murphy, for the purchase, subdivision and sale of the real estate herein involved. The property was to be bought for $110,000, on a 90-day option, $2,000 down, $18,000 more at the end of 90 days, and the balance of $90,000 to be paid in five annual instalments of $18,000 each. The proposition involved a subdivision into lots and a quick sale of the lots at a fair profit; the actual payments collected from the purchasers of the lots to carry along the deal without further investment, and that it should

be handled on the syndicate plan. Others beside Murphy and Lorimer were mentioned as being willing to interest themselves in the property. Bromann went with Dorman and had several interviews with Murphy, Lorimer, Loeffler, Feinberg and Engel. The matter was discussed and it was agreed that the property should be divided into 272 lots and sold at an average price of $550 a lot; that it should be handled on the so-called syndicate plan; that certificates should be issued representing the lots and then sold, $25 earnest money to be collected as each certificate was sold; that when all the shares were sold the lots should be sold at auction, according to a prearranged plan; that whatever lots were left would then be distributed, by lot, among those of the seven who had not bought any lots. Each one agreed to take one-seventh of the lots and bound himself either to dispose of one-seventh of the lots or be responsible for that amount. Pursuant to those negotiations Murphy, Lorimer, Feinberg, Loeffler, Dorman, Bromann and Fred C. Engel, together, contracted for the purchase of the property by paying down the $2,000, each paying one-seventh of that amount.

There was some discussion as to whose name the title should be taken in and it was finally agreed that it should be taken in the name of Bromann. Accordingly, on June 27, 1892, a written contract was entered into between Sarah A. Greenleaf and Charles H. Bromann for the purchase, by the latter, of the property for $110,000. The $2,000 was then paid down, $18,000 was to be paid in 90 days, and the balance in five annual payments of $18,000 each. Provision was made in the contract that when the trust deed was executed lots might be released from time to time on the payment of sums to be ascertained from a schedule of prices which was to be attached to the trust deed when executed. The time for the completion of the contract was subsequently extended to September 30, 1892.

Greenleaf et al. v. Feinberg et al., 210 Ill. App. 271.

Some time in June, 1892, Engel, after having paid his one-seventh of the $2,000, finding that he was unable to dispose of his share of the lots, sold his interest to the defendant Adolph J. Sabath.   Thereafter, all seven of the interested parties—Sabath having taken the place of Engel—proceeded with the work of subdivision, surveying, platting, obtaining of abstracts, preparation of certificates, putting in of curbing, lamp-posts, sidewalks, and doing all that was essential in the furtherance of the purposes of the syndicate.   About 230 of the certificates, each representing a lot, were sold to outsiders; the remainder of the 272 being held by those who failed to sell their full one-seventh share.   When each share was sold, $25 in earnest money was collected.   The money that was taken in was kept by different members and meetings were held, from time to time, at which the business of the syndicate was discussed.   The property was popularly known as the "Kedzie Avenue Land Association Subdivision."   The rules that were to govern interests in the property were agreed upon by the seven and were printed on the backs of the receipts which were given for deposits made on account of the purchase of shares.   Those rules provided, among other things, that when all the shares were subscribed for, a meeting of the shareholders of the syndicate would be held for the purpose of auctioning off the lots; that the lots should be sold in a certain order, which was mentioned, and none but shareholders would be entitled to bid; that no one could buy more lots than he had shares.   The terms as to payment were: "$25 per share as earnest money; 10 per cent. on the night of the auction, and the balance of one-quarter of the amount of the purchase price on the delivery of the contract, and the balance on or before 1, 2, 3, 4, 5 and 6 years."

On September 21, 1892, two days prior to the time set for the auctioning off of the lots, the seven mem-

bers of the syndicate, Feinberg, Loeffler, Lorimer,
Murphy, Dorman, Sabath and Bromann, entered into
a written agreement which recited, among other
things, whereas they were all interested in and "owned
a certain contract executed and entered into by and
between Charles H. Bromann and Sarah A. Greenleaf
*   *   *   for the purchase of a certain tract of
land   *   *   *   and whereas,   *   *   *   Bromann now
holds said contract for the mutual benefit of the
above named persons, and whereas, each of the above
named persons contributed one-seventh of the pur-
chase money   *   *   *   and each of the above persons
own an equal one-seventh share or interest in said
purchase,   *   *   *   it is agreed   *   *   *   that they will
subdivide the said premises into 272 lots and sell the
same at the average price of $550 per lot or share.
*   *   *   that each of the above named persons shall
sell his proportionate share   *   *   *   or *   *   *   he
will then hold the balance of his shares unsold.   *   *   *
that each   *   *   *   shall be entitled to the benefits
and profits derived from the sale of his proportionate
share.   *   *   *   that all the expenses and loss main-
tained in this undertaking shall be borne by the parties
hereto.''

On September 23, 1892, an auction was held and
about 85 per cent. of the lots were sold, and each pur-
chaser paid $25 on each lot and 10 per cent. of the
balance of the purchase price.  Shortly after deeds
were issued and, at that time, each purchaser paid up
the balance in cash, if any, and received his deed.
Each buyer assumed his proportion—according to the
schedule attached to the trust deed, of the $90,000—
which remained due of the original purchase price,
and the balance, if any, of the three-fourths of the
purchase price of each lot, which was not represented
by the original trust deed, was paid in cash or by a
note secured by a second mortgage, which the pur-
chaser signed at the time he took up his deed.  Those

second mortgages were payable in one year. Although the trust deed from Charles H. Bromann to John A. Phillips, trustee, and the five promissory notes, each in the sum of $18,000, were all dated September 1, 1892, they were all actually signed and the trust deed acknowledged on October 3, 1892, and filed for record on the same date.

On December 5, 1892, Lorimer, Sabath, Loeffler, Feinberg, Murphy, Dorman and Bromann met and had an accounting and divided among themselves the net proceeds of the sale. The accounting showed that the gross receipts from the sale of the lots amounted to $39,833.97; that out of the gross receipts the following amounts had been paid: $18,000 to said Phillips, trustee, on account of the contract of purchase of said property from Sarah A. Greenleaf, together with $975 accrued interest; $540.28 for assessments; $1,838.85 for sidewalks; $150 for abstracts; $204 to Bromann for services as secretary; $235 for laying out streets; $51.75 sundry expenses; $208.50 for surveying; $23.50 for recording fees; $150 to Fliehman for attorney's fees, and $375 to John D. Casey for attorney's fees, making a total expense of $22,751.88, leaving a balance of $17,082.09, which latter sum was equally divided among the seven, namely: William J. Murphy, William Lorimer, Jacob Feinberg, William Loeffler, A. J. Sabath, J. F. Dorman and Charles H. Bromann. The second mortgage notes above described were likewise equally divided between the same seven parties and where an exact division was not possible, the amounts were equalized by notes from one partner to another.

. The various amounts to be paid for the release of lots in said subdivision were figured out after the auction sale and a schedule thereof was subsequently attached to the trust deed. The trust deed contained the conventional covenants and agreements but also provided for the release, from time to time, of certain

lots on the payment of certain fixed sums. The first two of the $18,000 notes were paid in full, the last three remaining unpaid. On May 26, 1898, the trustee, John Phillips, resigned, and Ullman Strong became trustee in his stead. Lots were released from the lien of the trust deed from time to time, leaving, at the time the amended and supplemental bill of complaint was signed, about 36 lots unreleased and subject to the lien of the trust deed for part of the purchase price of said property.

On June 22, 1909, William Loeffler died testate and the defendant Frances Loeffler was appointed executrix. On June 28, 1909, his will was admitted to probate. Frances Loeffler was the sole legatee and devisee. She paid out over $50,000 worth of claims which were not presented in the Probate Court but which claims were found to be valid claims against the estate. When the estate was finally closed in the Probate Court in May, 1912, there was no balance left.

As to the principal and interest due defendants in error, the obligation of the copartners and syndicate, Bromann made collections, from time to time, of amounts that were due from different lot owners and turned the money over to defendants in error and credit was given therefor on the principal, interest and taxes that were due. In the years 1896 and 1897, the defaults began to endanger foreclosure, and in the year 1898 he called a meeting, through his attorney, of the seven interested parties, and their assistance was asked in order to prevent foreclosure. The defaults continuing, foreclosure proceedings were instituted, the property sold and the deficiency decree, complained of, was entered.

The contentions of the plaintiffs in error may be classified as follows: (1) that the allegations in the amended and supplemental bill of complaint are insufficient; (2) that the plaintiffs in error are not personally liable for the deficiency; (3) that the defend-

ant in error A. J. Sabath, not having taken part in the original oral contract, is not personally liable; (4) that as to the defendant in error Frances Loeffler, executrix, the testimony of Bromann was incompetent; (5) that the defendants in error released Bromann from liability and as a result his co-obligors were likewise released; (6) that inasmuch as the defendants in error did not sign the trust deed they were not bound for taxes, special assessments and other similar charges.

(1)   It is contended that the allegations in the amended and supplemental bill are insufficient. It was not necessary in such a pleading, after alleging that the seven persons—evidently meaning those constituting the original copartnership—held the title and executed the notes and trust deed, under the name and style of Charles H. Bromann, to go on and give in detail a history of the syndicate or copartnership proceedings.   The recitations in the amended and supplemental bill of complaint amply informed the defendants in error of the claim that was made and were a sufficient basis for the decree which was entered.   In a bill to foreclose the important elements are the notes, trust deed, default and parties, all of which were properly set forth in the pleading in question, and, further, although an accounting was prayed, it was not necessary that the items of the prospective account should be anticipated and set forth in the pleading.   An examination of the record leads us to the conclusion that the amended and supplemental bill of complaint was sufficient to justify the evidence that was offered, and also that the pleading and evidence considered together amply supported the decree.

(2)   It is contended by plaintiffs in error that they are not personally liable for the amount of the deficiency and that, accordingly, the decree which was entered is erroneous.   The evidence shows—no evidence was offered on behalf of the plaintiffs in error

to the contrary—that at the outset the seven partici-
pants, Feinberg, Loeffler, Lorimer, Murphy, Dorman,
Engel and Bromann, entered into an oral agreement
that they would buy a certain piece of real estate, take
the title thereto in the name of Bromann for the bene-
fit of all of them, subdivide the property into lots and
then handle it on a certain prearranged syndicate plan
for their mutual pecuniary profit.   It is the law that
a partnership may adopt the individual name of one
of its members as the name under which it shall do
business, and bind itself and each of the partners by
the use of that name.   "The firm name is such as the
copartners choose to adopt.   It may disclose the names
of all the partners or of none of them, or the name of
but one of them may be used as the firm name.  *  *  *
Where a written instrument bears the name of but
one person, presumably it is the undertaking of that
person; but it is competent to establish by parol proof
that the contract is that of the copartnership and that
the firm entered into the contract in the name and
style of the individual."   *Daugherty v. Heckard,* 189
Ill. 239; Story on Partnership (6th Ed.), sec. 138;
*Morse v. Richmond,* 97 Ill. 303.   In the latter case, the
fact that the word "trustee" was used after the sig-
nature of the partner does not materially distinguish
the facts in that case from those in the instant case.
When the name Bromann was signed to the trust deed
—even though with a seal—and to the notes, it repre-
sented an act which was directed and authorized by
the copartnership.   Also, the latter, at that time, had
received the consideration—the property having al-
ready been conveyed for its benefit—and certainly it
would be highly inequitable, after receiving that con-
sideration pursuant to the agreement of the copart-
nership, to hold that Bromann alone was liable on the
notes and trust deed.   Such cases as *Walsh v. Van
Horn,* 22 Ill. App. 170, in which latter case the court
refused to hold an indorser at the suit of a mortgagee,

and said, "In this case there are no circumstances of equitable jurisdiction," are all clearly distinguishable from the one we are now considering. Further, if in the instant case the other members of the copartnership had paid the purchase price to Bromann, that would be a strong reason for holding that the defendants in error had no right against the plaintiffs in error, which latter might be said to have stood in the position of an undisclosed principal. But, considering all the evidence as it stands, and the principles of law that are applicable thereto, we are of the opinion that the result of the oral agreement of the seven parties, and the execution by Bromann, in fulfilment of that agreement of the notes and trust deed—all of which, taken together, constitute the creation and the act of a copartnership—and the long series of acts constituting unquestionable ratification by the copartnership, was in equity to make each and all of them jointly and severally liable for the notes and trust deed. *Morse v. Richmond, supra; Mission Ridge Land Co. v. Nixon* (Tenn.), 48 S. W. 405; *Tyler v. Waddingham,* 58 Conn. 375; *Brooke v. Washington,* 8 Gratt. (Va.) 248.

Some claim is made that the Statute of Frauds is a defense as to all those who did not sign the notes and trust deed. The court said, in *Van Housen v. Copeland,* 180 Ill. 74: "An oral agreement to form a partnership for the purpose of trading in real estate for profit is not within the Statute of Frauds." *Fitch v. King,* 279 Ill. 62. From that it follows, of course, that any one member of a copartnership may sign a conveyance of real estate, and if with their consent, and ratified by them, as in the instant case, bind the copartnership and each of the members. Although partners may thus become liable for obligations growing out of the conveyance of real estate without their signatures, and, seemingly, therefore, without compliance with the requirements of the Statute of Frauds, such is the settled law of this State. As to the introduction

of parol evidence, it did not contradict the writing itself, the one who signed was not discharged, it merely made additional parties also liable. *Byington v. Simpson,* 134 Mass. 169.

(3) It is contended on the part of the defendant A. J. Sabath that, as he did not take part in the early transactions which led up to the original oral contract and was not a party to the latter, and as there is no writing signed by him by which he undertook to ratify, adopt or accept any part of the agreement of Bromann in connection with the notes and trust deed here sought to be enforced, he is not liable. The negotiations began in April, 1892, and on June 27, 1892, the written contract of purchase was entered into. In the latter month, Engel, after paying his one-seventh of the $2,000 earnest money, and finding that he would be unable to go on with his part, sold his interest to defendant in error Sabath, and from then on the latter took part in all the work undertaken and done in consummation of the purposes of the syndicate. On September 21, 1892, Sabath, in place of Engel, together with the other six interested partners, signed the agreement which recited that they owned the contract of purchase—referring to the contract of June 27, 1892, for the purchase of the property in the name of Bromann—that it was for their mutual benefit; that each one owned "an equal one-seventh share or interest in said purchase"; that they would subdivide and sell it in lots for $550 each; that each should sell his proportionate share or hold the balance unsold; that each should be entitled to the profits derived from the sale of his proportionate share; "that all the expenses and loss maintained in" the undertaking "should be borne by the parties" thereto.

Of course, as stated above, the trust deed and notes were not signed until October 3, 1892, almost 3 months after Engel sold his interest to Sabath. Then, too, Sabath took part in the auction of the lots and sub-

sequently received his pro rata share of the $17,082.09, that is, his one-seventh of that amount, and his share of the second mortgage notes. A careful examination of the fact leads us to the conclusion, not only that, as stated above, a partnership was created, but that Sabath by his purchase from Engel, by his signature to the agreement of September 21, 1892, by his conduct and its ratification by the other six interested parties, became a partner, and was, therefore, jointly and severally liable to the same extent as the other six. Counsel for Sabath insist that the evidence shows that each of the seven only agreed that the real estate should be divided and that each should "handle his own individual share." A careful analysis of the conduct of the parties and considering particularly the purport of the agreement of September 21, 1892, and the division of the proceeds at the time of the accounting, when each of the seven, including Sabath, was paid approximately $2,447.51, and his pro rata share of the second mortgages, leads us to the conclusion that it was a copartnership and resulted in the obligations here sought to be enforced.

(4) It is further contended that the testimony of Bromann, who was a defendant and an interested witness, is incompetent as against the defendant in error Frances Loeffler, who defended in her representative capacity as executrix, under the last will and testament of William Loeffler, deceased, and error is assigned on the ground that a motion to strike out his testimony was overruled. Section 4 of chapter 51, Ill. St. Ann. (J. & A. ¶ 5521) provides that: "In any action, suit or proceeding by or against any surviving partner or partners * * * no adverse party or person adversely interested in the event thereof, shall, by virtue of section 1 of this act, be rendered a competent witness to testify to any admission or conversation by any deceased partner * * * unless some one or more of the surviving partners * * * were also present at

the time of such admission or conversation," etc. The principle of that section of the statute seems to be to make Bromann a competent witness to testify to any admission or conversation by Loeffler (the deceased) which took place in the presence of any one or more of the other partners. We do not agree with counsel for plaintiffs in error that section 4 does not remove the disability created by section 2 (J. & A. ¶ 5519) in so far as the former pertains to admissions or conversations by a deceased partner in the presence of other partners. It will be observed that the latter part of section 4, which pertains to persons who have contracted with an agent of the adverse party, the agent having since died, expressly provides that witnesses who have been in that situation must also be competent according to sections 2 and 3 of the Act (J. & A. ¶¶ 5519, 5520). It seems to have been the purpose of the Legislature that section 2 should not apply to the situation of Bromann in the present case.

(5) It is contended that Bromann was released from his liability on the notes and trust deed and, therefore, that the plaintiffs in error, as co-obligors, likewise were released. Bromann testified that he had an "indirect understanding" with the defendants in error that "The deficiency decree will not be enforced or pushed" against him. "An indirect understanding" that a deficiency decree—to be obtained in the future in a pending suit—is not to be "enforced or pushed," is not an absolute and unconditional release. It certainly does not rise quite to the dignity of a covenant not to sue, and the latter has been held to be insufficient to discharge co-obligors. *City of Chicago v. Babcock,* 143 Ill. 358. The reason why a release of one is a discharge of all is because it destroys the right of contribution. *Parmelee v. Lawrence,* 44 Ill. 405. Where that right, as here, is unaffected, the liability of the co-obligors remains unimpaired. Further, the phrase "an indirect understanding" does not

necessarily mean a binding contract; so that, from the evidence, as the record presents it, we are unable to conclude that Bromann and, therefore, his co-obligors were released.

(6) As to the contention of the plaintiffs in error that—as they did not sign the trust deed and were not mentioned therein—no liability was incurred by them by reason of the agreements and covenants contained in said trust deed for the outlays of taxes, special assessments, cost of foreclosure and solicitor's fees, it is sufficient to say that the copartnership and, therefore, each and all of the copartners, having made the contract of purchase, and having bought the property, and having given the trust deed to secure the indebtedness represented by the notes, were bound, necessarily, by all the provisions and terms of the trust deed, and as the particular items of charge, referred to, were embraced within the provisions of the trust deed, they were properly included in the decree.

Finding no error in the decree, it is affirmed.

*Affirmed.*