JAMES R. HUTCHINSON, d/b/a T. K. O. Productions, Plaintiff-Appellee, *v.* BROTMAN-SHERMAN THEATRES, INC., *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 79-2349

Opinion filed March 31, 1981.

Richard Orlikoff and Alexander Terras, both of Chicago (Frankel, McKay & Orlikoff, of counsel), for appellants.

Reese & Schaffner, of Chicago (Sidney Z. Karasik and Michael Kreloff, of counsel), for appellee.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendants appeal from a judgment granting to plaintiff both compensatory contract damages and punitive damages sounding in tort. Questions raised on the pleadings include whether a partner may sue to enforce a partnership claim without joining all the partners as plaintiffs; pleadings were improperly amended to state facts inconsistent with facts stated in prior pleadings; a party may be added as a defendant during the course of trial by filing an amended complaint without service of summons; and a defendant may be denied leave to file a counterclaim where no counterclaim has been submitted to the court. Other issues

presented for review are whether punitive damages were properly awarded under the circumstances presented; contract damages may be awarded against a noncontracting party; the record supports a judgment against an added party; and other evidentiary and damage issues. For the reasons which follow, we vacate and amend in part and affirm.

The 1974 telecast of the Muhammad Ali and George Foreman heavyweight championship fight from Zaire, Africa (hereinafter the fight) was organized by two New York companies which, on June 3, 1974, conveyed to Herbert Muhammad (hereinafter Muhammad) exclusive telecast rights for the fight, including Chicago, Gary-Hammond, Indiana and downstate Illinois. He was granted the authority to negotiate or assign these rights to anyone he wished. Muhammad then allegedly assigned the Chicago and Gary-Hammond rights to a partnership formed after June 3, 1974, known as TKO Productions (hereinafter TKO), consisting of six partners, Irving Bloom, James Hutchinson, Walter Turner, Terry Shoemaker, David Potter and Charles Fritsch. Under the Muhammad-TKO assignment of rights, the latter agreed to pay the former $60,000 and meet certain other conditions required by one of the New York telecast promoters. On June 19, 1974, one of the TKO partners, Bloom, an attorney, contacted Oscar Brotman, president of both Brotman-Sherman Theatres, Inc. (hereinafter BST), and South Shore Amusements, Inc. (hereinafter SSA), who had exhibited many fights in the past. Brotman said he was interested in this fight and invited the TKO partners to meet in his office, which they did.

Brotman had been trying for some time to get the telecast rights to the fight for himself and, with the TKO partners present, he called the New York telecasting company to verify Muhammad's claim of exclusive rights, part of which TKO asserted possession. Confirmation of Muhammad's exclusive rights was made and the TKO partners and Brotman commenced negotiations, after which the TKO partners retired to Bloom's office and a draft agreement was typed for signatures. The partners then returned to Brotman's office with the agreement, which revealed the contracting parties to be "James R. Hutchinson, d/b/a T.K.O. Productions, hereinafter designated as First Party and Brotman-Sherman Theatres, Inc., hereinafter designated as Second Party." A cover letter signed by Hutchinson was attached. Brotman and Hutchinson signed the contract and some copies. The TKO partners returned to Bloom's office where they discovered that they had taken only unsigned copies of the agreement with them and had left two signed copies with Brotman. The TKO partners returned once again to Brotman's office and after discussion all agreed that paragraph 4 of the contract made little sense and the same was scratched out by Brotman and initialed by both Brotman and Hutchinson. Hutchinson and another partner, Shoemaker, returned to

Bloom's office and the agreement was redrafted deleting only paragraph 4, the balance being identical in all other respects. Hutchinson and Shoemaker then again returned to Brotman's office and asked to have Brotman sign the document. Brotman's receptionist, after announcing their visit and purpose, took it into Brotman's office and returned with it shortly thereafter handing Hutchinson the document bearing Brotman's signature, the authenticity of which is in dispute. The next day, a $60,000 escrow agreement was entered into between Brotman and Muhammad at Amalgamated Trust and Savings Bank in accordance with paragraph 1 of the June 19 agreement between the parties; however, a $5,000 escrow to be deposited with Chicago Title and Trust Co., in accordance with paragraph 2 of the agreement, was never opened.

The fight was telecast via closed circuit television on October 29, 1974. Plaintiff's evidence reveals that on the night of the fight, Brotman's general manager, Robert Kennedy, saw Hutchinson at the International Amphitheatre and showed him an alteration in paragraph 3 of the contract, which provided that instead of TKO receiving $1 per ticket after the $60,000 payable to Muhammad was recouped in gross receipts, TKO was to receive only $1 per ticket after the first 60,000 tickets were sold. This alteration was initialed only by Brotman, and Kennedy asked Hutchinson to add his initials to the alteration. Hutchinson refused, asserting reliance on the document as signed on June 19, 1974. TKO's efforts to secure compensation under the contract were unavailing.

A two-count unverified complaint was filed in December 1974 naming "Herbert Muhammad and James R. Hutchinson dba T.K.O. Productions" as plaintiffs and "Brotman-Sherman Theatres, Inc.," as defendant. Count I sought contract damages of the $5,000 in escrow money which would have been payable to TKO after the fight had been shown and $1 per ticket over the first $60,000 in gross receipts. Count II sought damages for BST's having displayed the fight downstate without authority, for which additional damages were sought. BST filed an answer denying that it had any agreement with plaintiff Muhammad, admitting that it established a $60,000 escrow, and denying that it was required to do so. Muhammad subsequently signed a release with BST, and he was later dismissed by stipulation in November 1976.

BST moved to dismiss the remaining action in October 1977, claiming that Muhammad was also doing business as TKO Productions and that since he had signed the release with BST, the basis of the lawsuit had been dissipated. An unverified amended complaint at law was thereafter filed by Hutchinson "d/b/a T.K.O. Productions" as plaintiff naming BST as defendant, this time alleging in count I that: Muhammad, possessor of exclusive rights of the distribution and showing by closed circuit television of the fight, had assigned part of his rights to the distribution of said fight

to plaintiff Hutchinson; the parties entered into a written contract with BST, a copy of which was attached as Exhibit A, purporting to incorporate the original June 19, 1974, agreement with paragraph 4 deleted; BST complied with the $60,000 escrow but violated the agreement to open the $5,000 escrow account; and BST refused to pay TKO the sum of $1 per ticket over the first $60,000 of gross receipts. Count II again claimed damages for the unauthorized display of the fight by BST to downstate communities. BST moved to dismiss the amended complaint based upon an asserted contradiction between allegations in the original complaint which described TKO's right to contract with Brotman as having been based upon Muhammad's "concurrence," and allegations in the amended complaint that TKO's right to contract with BST was based upon an "assignment" by Muhammad to TKO, and also upon the absence of other partners of TKO as parties plaintiff. Plaintiff added a third count to the amended complaint, claiming that Brotman had knowingly made false representations in order to induce TKO to transfer the rights to BST. The trial court denied defendant's motion to dismiss. During the course of the trial, pursuant to leave of court, a second amended complaint was filed adding SSA as a party defendant, over objections.

The cause was heard by the court without a jury, commencing in February, and continuing from time to time until the close of the trial on June 18, 1979. Plaintiff was awarded $29,837 plus interest from November 1, 1974. That figure was computed by taking gross receipts of $443,745 minus the first $60,000 payable to Muhammad; dividing the balance by $20 per ticket, leaving 19,187 tickets sold after the first $60,000 in gross receipts; and arriving at liquidated damages of $19,187. To that figure was added the $5,000 which was not put in escrow pursuant to paragraph 2 of the agreement and $5,650 for the $113,500 in gross receipts returned to ticket holders at three theatres which experienced mechanical breakdowns. In addition to the $29,837 plus interest, the court imposed an award of $30,000 in punitive damages based upon Brotman's conduct. On November 8, 1979, the court denied BST and SSA's motion to vacate or modify judgment. BST appeals from each of the above orders, and SSA appeals from those orders and judgments entered after it was made a party on February 28, 1979.

I.

BST and SSA first assert that the complaint should have been brought in the names of each of the six TKO partners rather than James R. Hutchinson doing business as TKO Productions and that they were misled into believing that TKO Productions was the name of a partnership composed of Herbert Muhammad and James R. Hutchinson. They insist that Hutchinson's failure to join his partners as plaintiffs or to fully and

fairly allege his relationship with those partners and with Muhammad severely prejudiced BST because BST effected a settlement of the original action with and obtained a general release from Muhammad believing that the entire claim set forth in the complaint was thereupon satisfied. They maintain that each partner has authority to settle debts due and owing to the partnership and that an obligee on a partnership claim is relieved of his obligations to the other partners by obtaining a release of one of them, so that the litigation should have been terminated in favor of BST. An examination of the pleadings does not support defendant's position.

■■ The second paragraph of the original unverified complaint states "that on or about June 19, 1974 First-Party with the concurrence of Herbert Muhammad entered into a written contract with Second-Party," defendant herein. The agreement of June 19, 1974, upon which suit was based, and a copy of which was attached, also referred to James R. Hutchinson doing business as TKO Productions as "First-Party." Nowhere in the agreement is Herbert Muhammad identified as the first party. The escrow, opened at the Amalgamated Trust and Savings Bank on the day after the agreement was executed, shows directions signed only by Brotman and Muhammad and reveals that the $60,000 to be paid BST into the escrow was to be transferred solely to the account of Muhammad without any reference to TKO or any of its partners. Further, the distinction was apparently clear enough at the time BST's answer was filed when it demanded strict proof of alleged "concurrence" between plaintiff Muhammad and Hutchinson. Additionally, evidence adduced at trial revealed that Brotman saw a letter from the New York closed circuit telecasting company granting exclusive telecast rights only to Muhammad, which were verified when Brotman called that company in the presence of the six TKO partners. Muhammad's personal right to assign the telecast was also then confirmed. The trial court concluded that the amendments were made to more clearly set out the relationships and that the same cause of action was stated in both complaints. We find no error in this conclusion.

■■ As to BST's complaint that Hutchinson should have been required to add the other members of the partnership to the suit rather than to have sued in his own name alone, the evidence shows that Brotman was well aware of all six partnership interests since all were seated in his office at the time he telephoned New York to verify the status of the assignment rights. Notwithstanding his knowledge, he was satisfied to proceed to contract with Hutchinson doing business as TKO Productions and suit was in fact brought in the same name as the party who signed the contract. Had BST experienced any confusion in this regard, resort could have been had to sections 37 and 45 of the Civil Practice Act (Ill. Rev.

Stat. 1979, ch. 110, pars. 37, 45) for a bill of particulars or to make the complaint more definite and certain. This he failed to do. In any event, the fact that Hutchinson had other partners in TKO Productions which may not have been apparent from the contract signed or from the allegations of the lawsuit is not fatal either to Hutchinson's rights or to the rights of the partnership, which may adopt the name of but one of its partners when it does business and yet establish by parol proof that a contract in that name is in fact a partnership. *Daugherty v. Heckard* (1901), 189 Ill. 239, 245, 59 N.E. 569; *Henry DeCicco & Co. v. Drucker* (1968), 101 Ill. App. 2d 340, 346, 243 N.E.2d 456; *Schalk v. Schaffer* (1954), 2 Ill. App. 2d 286, 119 N.E.2d 412 (abstract); *Greenleaf v. Feinberg* (1918), 210 Ill. App. 271, 282.

BST's assertion that Hutchinson alleged Muhammad to have been his partner in his pleadings and that based upon those allegations BST settled the action with Muhammad is belied not only by the pleadings, but the language of the release between Muhammad and BST, which identifies Muhammad only as a plaintiff in the action. It is notable that although BST extended the release to "Herbert Muhammad, his agents, employees, heirs, executors, administrators and assigns, * * *" no mention is made of his alleged partnership in that language. That the release would have included such remote contingencies with respect to Muhammad, but would have excluded what now appears to be BST's immediate concern, his asserted involvement in the partnership, defies credulity. We find no error in the trial court's refusal to dismiss the action on the basis of the release.

## II.

██ BST and SSA next argue that they were improperly denied leave to file a counterclaim against Turner during the trial. They assert that the relationship between Turner and the parties to the litigation was important because Turner was not only a partner in TKO but also an employee of BST. Defendants maintain that during the trial and after plaintiff's evidence had shown that Turner was a partner, BST requested leave to file a counterclaim against Turner which would have alleged that Turner had breached his fiduciary duty to his employer, BST, by independently obtaining the rights to the fight and reselling them via the conduit of TKO Productions to BST. No proposed counterclaim was ever tendered to the court. The trial court denied BST's motion because it found that Turner's relationship to BST did not affect the allegations of the complaint. Relying upon section 38 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 38), defendants maintain that the proposed counterclaim related to the same subject matter set forth in the complaint, exhibition of a

closed circuit telecast of the fight, and was directed to the actions of Turner in his capacity as a partner in TKO.

The postulation for which defendants contend may well be correct; however, the issue of whether the trial court abused its discretion in denying leave to file the proposed pleading cannot be reviewed since none was ever presented to the court. (See, *e.g., Lowrey v. Malkowski* (1960), 20 Ill. 2d 280, 285, 170 N.E.2d 147, *cert. denied* (1961), 365 U.S. 879, 6 L. Ed. 2d 191, 81 S. Ct. 1029; *Volvo of America Corp. v. Gibson* (1980), 83 Ill. App. 3d 487, 492-93, 404 N.E.2d 406; *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 362-63, 365 N.E.2d 684; *Hassiepen v. Marcin* (1974), 22 Ill. App. 3d 433, 435-36, 318 N.E.2d 162; and *Atlee Electric Co. v. Johnson Construction Co.* (1973), 14 Ill. App. 3d 716, 722, 303 N.E.2d 192.) Furthermore, Brotman had known that Turner was one of the TKO partners as early as the first meeting between him and the partners, or at best 16 months prior to the trial during the course of the deposition of Hutchinson taken October 26, 1977, when Hutchinson testified to that effect. No reason for the delay in filing the counterclaim appears under these circumstances; it should have been filed with BST's answer, as required by section 38(2) of the Civil Practice Act. (Ill. Rev. Stat. 1979, ch. 110, par. 38(2).) See also, *Harris v. Algonquin Ready Mix, Inc.* (1973), 13 Ill. App. 3d 559, 562-63, 300 N.E.2d 824, *aff'd in part, dismissed in part* (1974), 59 Ill. 2d 445.

### III.

The defense next assigns error in the trial court's decision to allow the addition of SSA as a party defendant without service of process as required by section 25(3) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 25(3)). The second amended complaint was submitted to the court near the close of plaintiff's evidence while Brotman was on the stand under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). The evidence adduced by plaintiff up to that point tended to show that all receipts and expenses of the fight were being funneled by BST through SSA, two close corporations of which Brotman was president. All income derived from the performance of the TKO agreement signed by BST was received by SSA. BST and SSA had the same officers and shareholders. Although BST had been incorporated for the purposes of attempting to find attractions to exhibit or to purchase realty or to enter into enterprises related to some form of show business, it possessed no realty in its own name, owned no theatres, had no office equipment but, as Brotman testified, "* * * we might have had some stationery, things like that."

The second amended complaint which joined SSA as a second

corporate defendant, among other things, alleged that: the transfer of rights to telecast from BST to SSA was part of Brotman's alleged fraud; Brotman was part owner and president of both corporations and Leonard Sherman was part owner and either secretary or treasurer of both; BST was a corporation without any real assets of its own and was a mere instrumentality of SSA with identical officers and shareholders with the objective of taking and performing BST's obligations, so that the contracting plaintiff would be unable to receive any recompense from BST; and additional alter ego interests existed between SSA and BST which promoted fraud and injustice. Judgment was sought against both BST and SSA. Also added to the second amended complaint was the allegation that Herbert Muhammad had orally assigned his rights to the telecasting of the fight to Walter Turner, a member of the group doing business as TKO Productions, a partnership. Thereafter, counsel for defendants argued, among other things, that Turner's inclusion as assignee of Muhammad's telecasting rights was directly contrary to the allegation of the first amended complaint and that SSA was not a contracting party and should not be liable for contract damages. Defense counsel also objected to the filing of the second amended complaint half way through the trial. No objection to jurisdiction or to the absence of service of process was mentioned. The trial court granted plaintiff leave to file the second amended complaint making SSA an additional defendant. Defense motions to strike counts III and IV were denied. SSA made no request for leave to file an answer to the complaint and no attempt to file one is reflected in the record.

A subsequent motion was made on behalf of SSA to dismiss counts II, III and IV for failure to state a cause of action. Count II named only BST as a defendant; count III named both BST and SSA as defendants; and count IV named only SSA as a defendant. Defense counsel's argument addressed itself to the proposition that the second amended complaint improperly sought punitive damages in an action for breach of contract; and that SSA should not have been included in the action because of its contractual nature, to which SSA was not a party. The motion was denied after further evidence was heard from the defense. Defendant's complaint of lack of opportunity to file an answer to the second amended complaint and its due process argument based thereon find no support in the record. That complaint was filed on February 28, 1979. The cause was continued from time to time due to unavailability of counsel and the illness of Brotman. It was heard next on May 21, 1979, again on June 15, 1979, and was concluded on June 18, 1979, a lapse of more than three months time within which SSA would have answered the second amended complaint or filed any motion with respect to the jurisdictional issue. Defendants

simply neglected to do that which they could have done in the intervening period and cannot be heard to complain of want of opportunity.

In closing argument, defense counsel addressed no issues relating to *in personam* jurisdiction of SSA, nor the absence of service of process, nor any refusal on the part of the trial court to allow SSA to file an answer. BST moved to vacate that portion of the judgment permitting punitive damages. Defense counsel also argued that count IV, which named solely SSA as a defendant and sought punitive damages therefrom, should be stricken because it simply added another party and that count IV did not differ in substance from count II, without reference to any jurisdictional issue. These motions were denied and judgment was entered against BST and SSA.

A written motion to vacate and modify judgment was filed thereafter and begins with the language,

> "Now come the defendants, Brotman-Sherman Theatres, Inc. and South Shore Amusements, Inc. by and through their attorneys * * *, pursuant to §68.3 of the Illinois Civil Practice Act, and respectfully move this court for an order vacating the judgment entered on June 18, 1979 and modifying the judgment order in that the damages assessed against defendants are excessive and improper. In support of this motion defendants state as follows: * * *."

In each of the following three paragraphs, as well as in the prayer for relief, the motion contains the following phraseology; "* * * defendants through their president" (par. 1); "* * * all tickets sold by defendants in Illinois and Indiana * * *" (par. 2); "the finding of this court that defendants' actions amounted to an independent tort * * *" (par. 3); and "wherefore, defendants pray * * *." As the foregoing demonstrate, the defense limited its argument to the merits of the amended cause of action and did not challenge *in personam* jurisdiction of SSA, nor did it complain of improper service or want of opportunity to answer.

■■■ Actions taken by litigants which recognize a case as being in court amount to a general appearance unless such actions were taken solely for the purpose of objecting to jurisdiction. (*Slade v. Bowman* (1977), 49 Ill. App. 3d 242, 246, 364 N.E.2d 922.) Defendants must be held to have waived any objections that they may have had as to want of *in personam* jurisdiction over SSA, improper service and denial of any opportunity to file an answer in light of the activities they undertook during the trial and the post-trial proceedings, which demonstrated their recognition that they were indeed "in court." (See *Brown v. VanKeuren* (1930), 340 Ill. 118, 121-22, 172 N.E.2d 1; *Finley v. Crossley* (1951), 409 Ill. 435, 100 N.E.2d 606, *cert. denied* (1952), 342 U.S. 904, 96 L. Ed. 677, 72 S. Ct. 295; *Widicus v. Southwestern Electric Cooperative, Inc.* (1960), 26 Ill. App. 2d 102,

110-11, 167 N.E.2d 799.) The absence of service of process under these circumstances did not affect *in personam* jurisdiction by the court over SSA.

## IV.

SSA points to what it deems is insufficient evidence upon which to support a judgment against it, since BST and SSA were two separate corporations engaged in different, albeit related, lines of business. The obligation to perform the contract with TKO was BST's which BST had partially performed by making the $60,000 escrow payment. SSA claims that it did not profit from the telecast at the expense of BST, but in fact sustained a loss of $249,158. The record reveals that after the June 19, 1974, contract was signed between TKO and BST, BST made no contractual arrangement in fulfillment of its obligation by way of arranging for telecasts, selling tickets, renting halls or leasing equipment. Rather, all of the foregoing activities were performed by SSA without any indicium of a legal obligation to do so existing between BST and SSA. SSA signed all leasing agreements for the exhibition halls and for the equipment to be used; it ran the fight telecast; it received $443,745 in gross receipts; and it paid all expenses. According to Brotman's evidence, BST had no assets aside from stationery. Counts III and IV of the second amended complaint charged that BST had shifted its telecast rights and responsibilities to its alter ego SSA without TKO's consent for the express purpose of denying to TKO its right to collect its percentage of the receipts from BST with which it had contracted. The ability to do what was done in this case emerges from the fact that the two companies had the same officers and shareholders and on other occasions had taken over contracts and done business for the other. The differences between the two entities were thus, at best, transient if not evanescent.

■■ The shifting of the responsibilities and benefits from BST to SSA placed TKO in a position of having to deal with a corporation in relation to remuneration with which it had no previous legal arrangement. The circumstance was exacerbated by the suggestion attributed to Brotman by Turner, who appears to have been Brotman's employee in both the BST and SSA corporations as well as a partner in the TKO entity, when Brotman was alleged to have told Turner at Brotman's office, "Let's tear up this contract. We don't need these guys. Let's you and I handle the deal. What do we need them for?" The trial court, under the foregoing evidence, could have considered the transfer of the rights from BST to SSA as a different method of "tearing up the contract," and had ample evidence upon which to base its determination to pierce the corporate veil and hold SSA responsible for the obligations of BST since, through Brotman, it had arrogated unto itself BST's rights thereunder. The record

demonstrates the requisite unity of interest in ownership upon which to consider the individuality of BST as having ceased and dissipating the fiction of separate existence under circumstances which would sanction a fraud and promote injustice. (*People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29, 277 N.E.2d 844; *Federal Insurance Co. v. Maritime Shipping Agencies, Inc.* (1978), 64 Ill. App. 3d 19, 380 N.E.2d 873; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 324-25, 372 N.E.2d 1043; *Ampex Corp. v. Office Electronics, Inc.* (1974), 24 Ill. App. 3d 21, 24, 320 N.E.2d 486.) In consideration of the foregoing, we find no error in the trial court's conclusion that SSA must answer in damages for the failure of BST to perform its obligations under the contract.

## V.

It is argued next that Brotman had never signed the contract upon which suit was brought and that there was no other evidentiary basis upon which to support judgment entered by the court against BST. Turner testified that he saw Brotman sign the document revised by omitting paragraph 4 and returned to Brotman's office for signature. Hutchinson, however, recalled that he, Turner and Shoemaker were together in another room while the contract was being signed on that occasion. Defendants avow that Brotman's signature was forged on the copies of the contract TKO relied on, and that he signed only one of the contracts, which defendant submitted in evidence, and which they claim the trial court should have accepted. Paragraph 3 of defendants' version, however, contained an alteration initialed only by Brotman, which significantly changed the understanding between the parties with respect to the threshold figure upon which plaintiff's percentage of compensation was to have become operative, from $1 per ticket after the first $60,000 in gross receipts was received to $1 per ticket after the first 60,000 tickets had been sold. Brotman testified that two alterations were effected on the contract at the same time. Only one of these, the deletion of paragraph 4, is initialed by both Brotman and Hutchinson. Although the crucial alteration was made in paragraph 3, inexplicably, only Brotman's initials appear on that change. The trial court also had heard evidence that as late as the night of the fight, Kennedy, Brotman's manager, had requested Hutchinson to agree to the change and initial paragraph 3 of the contract, which Hutchinson refused to do. Defendants argued at trial that only the one initialing by Hutchinson was necessary for all the changes, yet no explanation was made as to why Brotman found it necessary to initial two changes. Under the evidence the trial court had the right to reject defendants' version of the agreement.

■■ With respect to the alleged forgery of Brotman's signature, each

complaint filed alleged the existence of the contract between the parties and a copy thereof was incorporated as an exhibit, which constituted part of the pleadings for all purposes under section 36 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 36). Defendants filed no verified pleading denying the execution of the contract, which, under section 35(2) of the Civil Practice Act, is deemed to have been properly executed (Ill. Rev. Stat. 1979, ch. 110, par. 35(2)). (See, *e.g.*, *William Aupperle & Sons, Inc. v. American National Bank & Trust Co.* (1975), 28 Ill. App. 3d 573, 329 N.E.2d 458.) Defendants nonetheless were permitted to question whether the signature was actually Brotman's. His handwriting expert testified that it was a forgery. The testimony of that expert was based upon a single exemplar, however, and the trial court could have disbelieved his opinion. Further, the evidence shows that the contract upon which plaintiff relies was brought to Brotman's office for his signature by two of the TKO partners. There, after their presence and business were announced by Brotman's receptionist, the latter took the contract into Brotman's inner office, and shortly thereafter emerged from that office with Brotman's name affixed thereto. Another inference available to the trial court from this evidence was that if the signature was not actually affixed by Brotman, it was so affixed upon his procurement and authority. *Davis v. Cleghorn* (1861), 25 Ill. 194, 196; *Tunison v. Chamblin* (1878), 88 Ill. 378; *Witt v. Panek* (1951), 408 Ill. 328, 333, 97 N.E.2d 283; *Miller v. Swanson* (1965), 66 Ill. App. 2d 179, 192, 213 N.E.2d 294.

Defendants also claim that assignment of rights by Muhammad to TKO was not proven. Turner testified that Muhammad had orally assigned his exclusive telecasting rights for Chicago-Gary-Hammond and downstate Illinois to him for $60,000, which rights he in turn utilized in the creation of the partnership, TKO Productions. Payment for those rights took the form of the $60,000 escrow deposited by BST for Muhammad. In this way, TKO possessed the exclusive rights to the telecast for those areas. There is no question concerning Muhammad's exclusive rights and his authority to assign those rights to others. There is sufficient evidence to support the conclusion that he did so. That Brotman understood the arrangement is evidenced by his having placed $60,000 into an escrow only for Muhammad under paragraph 1 of either version of the contract. There is nothing in the record to show that he had any independent arrangement with Muhammad, who must be held to have received the $60,000 on the day after the fight only by virtue of TKO's contract with Brotman, in fulfillment of TKO's assignment from Muhammad. We see no failure of proof with respect to the assignment.

## VI.

Defendants correctly cite the long-settled rule that a contracting

party suing for breach of contract is entitled only to the benefit of his bargain, namely, compensatory damages. (*Hayes v. Moynihan* (1869), 52 Ill. 423, 426; *Ledingham v. Blue Cross Plan for Hospital Care* (1975), 29 Ill. App. 3d 339, 350, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75; *Wallace v. Prudential Insurance Co.* (1973), 12 Ill. App. 3d 623, 629, 299 N.E.2d 344; *Sears v. Weissman* (1972), 6 Ill. App. 3d 827, 834, 286 N.E.2d 777; *Alsip Homebuilders, Inc. v. Shusta* (1972), 6 Ill. App. 3d 65, 69, 284 N.E.2d 509; *Ash v. Barrett* (1971), 1 Ill. App. 3d 414, 419, 274 N.E.2d 149.) They also recognize the exception to the rule therein set forth permitting an award of punitive damages where the breach of contract amounts to a separate and independent tort, but claim that plaintiff failed to come within the exception because he has not shown that the contract on which he sued was fraudulent; and that representations as to future events and conduct cannot constitute fraud even if made with knowledge of their falsity, citing *Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912, *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393, and *Polivka v. Worth Dairy, Inc.* (1974), 26 Ill. App. 3d 961, 328 N.E.2d 350. Defendants attack counts II and IV of the second amended complaint, which purport to set out causes of action for fraud against BST and SSA, for having failed to allege clearly what misrepresentations were made, and assert that there is no proof in the record of any such misrepresentations which would support the claimed independent tort.

Plaintiff concedes that no punitive damages can be awarded for breach of contract, but asserts that he was properly awarded damages upon allegations and proof of an independent tort, *i.e.*, Brotman's flagrantly fraudulent conduct in attempting to deceive and cheat plaintiff of compensation to which he was entitled under the TKO-BST contract. He asserts that among the claims proven were that BST did not pay the promised $5,000 escrow to plaintiff under either version of the contract; BST's president, Brotman, suggested to Turner that BST's contract with TKO be torn up and ignored; Brotman altered a material term of the contract which would have cheated TKO out of any possibility of compensation; SSA took over the telecast rights in downstate Illinois although those rights belonged to TKO which were never conveyed to it; BST's business was shifted out of the shell corporation and into SSA without knowledge or consent of plaintiff in order to deny plaintiff his percentage of the receipts; and Brotman misrepresented to plaintiff that the signature on the retyped copy of the contract was genuine since Brotman had been told by his receptionist that Hutchinson and Shoemaker had brought the retyped copy of the agreement for his signature, the receptionist brought the contract to Brotman's offices, and returned with it ostensibly bearing Brotman's signature.

Plaintiff points to allegations of misrepresentation in count IV which charge BST with having entered into the contract as a separate entity although at all times it was merely an instrumentality of SSA; that the reason for the transfer of the performance of contracts entered into by BST to SSA was that BST had no real assets of its own with which to pay plaintiff; the presentation of the fiction of separate corporations under these circumstances would promote injustice and constitute a fraud on people or individuals contracting with BST and present obstacles to the protection of the rights of those persons dealing with BST, which entered the contract with the intention of defrauding plaintiff of rights and profits from said fight; and BST's president, Brotman, induced plaintiff to transfer his rights based upon false and misleading representations which Brotman knew were false and deceptive and that he made them with the intent to deceive plaintiff to his damage.

██ Plaintiff relies upon *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, *Laughlin v. Hopkinson* (1920), 292 Ill. 80, 126 N.E. 591, and *Ledingham v. Blue Cross Plan for Hospital Care* as authority for his position. In *Kelsay*, the supreme court observed that punitive or exemplary damages may be awarded under circumstances of fraud, actual malice, deliberate violence or oppression or when the defendant acts wilfully or with such gross negligence as to indicate a wanton disregard for others; such damages when assessed are in the nature of punishment, warning and example in order to deter the defendant and others from committing like offenses in the future. In the case before us, it is clear from its comments that the trial court was not basing the award of punitive damages upon breach of contract, but rather upon the independent tortious acts of Brotman, the common president of both BST and SSA, as detailed in the foregoing paragraphs. Prominently mentioned by the court was the deterrent effect that the award of punitive damages would have. The record supports the conclusion of the trial court that an independent tort had been pleaded and proven; we find no error in that conclusion.

## VII.

██ Defendants insist that damages awarded based upon 1,805 tickets sold at downstate locations were improper because plaintiff's counsel, during the trial, stated, "I have withdrawn any complaint, any charge, any allegation dealing with downstate, your Honor," thus abandoning any claim for the $1,805 attributable to that claim. Plaintiff seeks to retain the sum under the allegations of count I, the basic breach of contract action; however, it is clear from trial counsel's comments that such a claim had been withdrawn from all counts. The $1,805 should have been deleted from the compensable damages awarded to plaintiff under these circumstances and the award must be revised to that extent. The defense

also urges that no damages should have been awarded on the basis of BST and SSA's unsatisfied claim against its insurers for refunded tickets because of mechanical failures at three theatres, noting that the trial court awarded $5,650 in compensatory damages to plaintiff on the basis of a $113,500 claim. The record supports plaintiff's assertion that the trial court recognized plaintiff's entitlement to a percentage of gross receipts, rather than a percentage of profits. The evidence demonstrated that all expenses were to be borne by defendants under the contract; it was therefore within the court's latitude to award such damages. *Harry Alter Co. v. Chrysler Corp.* (7th Cir. 1961), 285 F.2d 903, and *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 115 N.E. 389.

For the foregoing reasons, the award of $29,837 for compensatory damages must be vacated and will be amended here (Ill. Rev. Stat. 1979, ch. 110A, par. 366(a)) to reflect the necessary subtraction of $1,805 therefrom, leaving a total of $28,032 in compensatory damages. The judgment is affirmed in all other respects.

Vacated and amended in part, and affirmed.

DOWNING and PERLIN, JJ., concur.