In re KHAM & NATE'S SHOES NO. 2, INC., Debtor.

KHAM & NATE'S SHOES NO. 2, INC., Counterclaimant,

v.

The FIRST BANK OF WHITING, Counterdefendant.

Bankruptcy Nos. 84 B 324, 88 A 970.

United States Bankruptcy Court, N.D. Illinois, E.D.

March 3, 1989.

James H.M. Sprayregen, Rudnick & Wolfe, Chicago, Ill., for debtor.

Robert Stochel, John M. O'Drobinak, Crown Point, Ind., Robert J. Walinski, Chicago, Ill., for counterdefendant.

## MEMORANDUM OPINION AND ORDER

DAVID H. COAR, Bankruptcy Judge.

This cause coming on to be heard on the Debtor's Motions for Partial Summary Judgment on the Debtor's Objection to Claim and counterclaims against the First Bank of Whiting, and the Court, having considered the record and pleadings on file in this case, having considered the memoranda of law submitted by the parties in support of their respective positions, and being fully advised in the premises, now enters its ruling;

This is a core proceeding over which the Court has jurisdiction, pursuant to Title 28 U.S.C. § 157(b). For the reasons set forth below, the Debtor's Motions for Summary Judgment are granted in part, and the following constitutes the Court's findings of facts and conclusions of law, pursuant to Bankruptcy Rule 7052.

### FINDINGS OF FACTS.

The facts at issue in the instant matter are essentially the same as the facts presented at the confirmation hearing on the Debtor's Third Amended Plan of Reorganization. Therefore, to the extent that questions of fact decided at confirmation are presented here, the Court adopts its findings of facts as set forth in its Memorandum Opinion and Order [confirmation order], dated October 20, 1988, confirming the debtor's Third Amended Plan of Reorganization. The relevance of any factual inquiry then is whether the legal import of the facts determined at the confirmation hearing is such that the Debtor is entitled to judgment on the causes of action alleged as a matter of law.

Kham & Nate's Shoes No. 2, Inc. [Debtor], is a retail shoe business in Chicago, Illinois. In the fall of 1983, the Debtor was having problems obtaining working capital to operate its expanding shoe business. In

September 1983, the Debtor began discussions with the First Bank of Whiting [Bank], Indiana, through its senior Vice–President, Donald O. Cassaday, concerning a loan to ease its cash flow problems. As a result of the Debtor's discussions with Mr. Cassaday, the Bank issued certain letters of credit to the Debtor. These letters of credit were unsecured.[1]

In December 1983, the Debtor again met with Mr. Cassaday at the Bank's offices in Indiana. At that meeting, Mr. Cassaday enumerated several conditions upon which the Bank would approve a $300,000.00 line of credit to the Debtor for working capital in order to sustain its business. On January 4, 1984, a commitment letter was issued by the Bank. One of the conditions contained therein was a requirement that the Debtor file for relief under Chapter 11 of the Bankruptcy Code. To this end, Cassaday provided to the Debtor the names of several attorneys, including one of the Debtor's attorneys, Mr. Golding. The issuance of the $300,000.00 line of credit was to be an interim step "bridge" loan. The ultimate plan was for a $1.2 million Small Business Administration guaranteed loan that would be used to fund a plan of reorganization.

On January 11, 1984, the Debtor filed its Chapter 11 petition. Since that date, the Debtor has retained possession of its assets and has continued to operate its business as Debtor–In–Possession.

On or about January 14, 1984, the Debtor filed its Application to Borrow Money and Grant Security Interests [Financing Application]. In the Financing Application, Debtor sought approval of a Loan and Security Agreement [Loan and Security Agreement] related to the $300,000.00 line of credit. On January 29, 1984, the Court entered an order [Financing Order] approving the Application and the Loan and Security Agreement granting the Bank a § 364(c)(1) lien on essentially all post-petition assets of the Debtor, namely the Debtor's inventory.

The Bank advanced the Debtor approximately $100,000.00 under the Loan and Security Agreement. Most of these funds were used to repay credit extended by way of draws on the eight letters of credit issued by the Bank pre-petition. These letters of credit and how they came to be used are significant in this case.

In December 1983, the Bank advised the Debtor not to pay suppliers so that cash could be accumulated prior to the filing of the Chapter 11 petition. As a result, the suppliers called upon the Bank to honor its obligations pursuant to the letters of credit. After the petition was filed, the Bank advanced funds to the Debtor pursuant to the Loan and Security Agreement to repay the Bank's advances on the letters of credit. Thus, the Bank acquired a post-petition lien on previously unencumbered assets of the Debtor in order to repay a pre-petition, unsecured obligation.

The Financing Order provided that the Loan and Security Agreement could be terminated by either party upon five days' written and telephonic notice. On or about February 14, 1984, the Bank's Board of Loan and Investment Committee [BLIC] directed Cassaday to terminate the line of credit. The reason given for the termination was that the BLIC did not like the nature of the credit with the Debtor in a Chapter 11 case, the BLIC did not like the location of the Debtor's business, and did not think that the Bank should be doing business on the south side of Chicago. The Bank claims that the BLIC was unaware of the letters of credit issued prior to the Chapter 11 case until the post-petition financing arrangement was presented to the BLIC after the Financing Order had been entered. The Court finds this testimony incredible.

Although the Bank decided to terminate the line of credit on February 14, 1984, it did not inform the Debtor until two weeks

---

**1.** These letters of credit were undated at the time that they were executed, and the Bank later altered and dated them without the Debtor's knowledge or consent, which the Debtor claims included terms of payment favorable to the Bank. See Bank exhibits 12–21, some of which the Debtor claims were dated after termination of the line of credit. [The exhibits referred to herein are exhibits admitted at the confirmation hearing, unless specified otherwise.]

later. In fact, counsel for the Bank, Mr. Stochel, attended a creditor's meeting, fully aware of the Bank's decision to terminate, and failed to mention the Bank's decision while affirming to those present that the Court had entered the Financing Order approving the Loan and Security Agreement. This amounts to a representation that the Bank would be financing the Debtor's reorganization. Mr. Stochel denies that he ever affirmatively represented that the Bank would be financing the Debtor's reorganization, but there is no doubt that the Debtor and others present at that meeting of creditors believed that this was the case. Failure to disclose the Bank's decision to terminate the line of credit under these circumstances had the same effect as would have an affirmative representation.

On February 29, 1984, some 30 days from the effective date of the Loan and Security Agreement, the Bank notified the Debtor, in writing, that it intended to terminate the line of credit with five days' notice. The required five-day telephonic notice was never provided. The Bank gave the Debtor no reason for the termination in its written notice. There had been no material change of circumstances between the time the Bank and the Debtor entered into the Loan and Security Agreement and the date on which the Bank terminated the Loan and Security Agreement. The Debtor had complied with each condition required by the Bank, and was current in its payments without any difficulty whatsoever.

In April 1984, Bank's President, Michael Schrage, explained to Khamalow Beard, one of the principals of the Debtor, that he did not understand why the Debtor had come to Indiana for financing, that the Bank did not want to do business with the Debtor, and that the Debtor should go back to its own neighborhood to obtain financing.

Schrage's April 26, 1988, deposition suggests that an alternative reason for the termination was an internal conflict at the Bank between Cassaday, as Senior Vice President/Senior Lending Officer and Schrage, as President.

After the Bank terminated the line of credit, the Debtor was unable to borrow funds from other sources because its assets were encumbered by the Bank's lien. As a result, the Debtor sustained substantial damage to its business; the Debtor incurred additional inventory costs as it became necessary for the Debtor to purchase all of its inventory on a COD basis, and the Debtor forfeited a discount for its non-COD cash purchases of inventory; the Debtor was unable to purchase inventory from its former suppliers and was thereby compelled to purchase inventory of an inferior quality from other sources at higher prices; and the Debtor sustained substantial sales losses because of its inability to obtain adequate quantities of inventory of a proper quality by purchasing on a COD basis. This resulted in the closing of stores, and the cancellation of plans to open a new store. Projected income under the Debtor's business plan was not realized.

The Bank was very much aware of the Debtor's arrangements with its suppliers as the Bank was informed of all the Debtor's obligations and agreements with its suppliers prior to the structuring of the Loan and Security Agreement.

The Debtor repaid approximately $81,000.00 of the funds the Bank advanced to it, approximately $35,000 of which was repaid prior to the termination. In January 1985, the Debtor made a $10,000.00 payment to the Bank which the Debtor claims was an attempt to show its good faith and to help negotiate a reasonable interest rate on its remaining outstanding debt under the Loan and Security Agreement. The Bank accepted the $10,000.00 but rejected the Debtor's proposed payment plan.

Having failed in its efforts to reconcile its differences with the Bank, the Debtor sought to equitably subordinate the Bank's claim and transfer the Bank's lien to the estate as part of the Debtor's Third Amended Plan of Reorganization.

The Court confirmed the Debtor's Third Amended Plan of Reorganization in a Memorandum Opinion and Order [confirmation order], dated October 20, 1988, which in-

cluded the equitable subordination of the Bank's claim and the transfer of the Bank's lien to the estate. The Court concluded that the Bank had acted in bad faith in terminating the line of credit, that the bad faith conduct of the Bank had caused damage to the Debtor and its creditors, and that equitable subordination of the Bank's claim in its entirety was required to offset the damage to the Debtor and its creditors.

On December 14, 1988, the Debtor filed an objection to claim and counterclaims, including a request for injunctive relief, against the Bank, alleging, *inter alia,* that the Bank's claim is not accurately documented, that the proof of claim does not account for post-petition payments, and that the Bank had engaged in bad faith conduct, fraud and breached the Commitment Letter and Security Agreement. The Bank denies the essential allegations of the Debtor's claims.

The Debtor has filed two motions for partial summary judgment, the first as to Count IV for injunctive relief, and the second as to Counts I–III, breach of duty of good faith, fraud, and breach of contract respectively. The Bank opposes these motions and has filed its own motion to dismiss. The Court will consolidate and consider these matters collectively.

## DISCUSSION.

The issue here is simply whether the Debtor is entitled to summary judgment on the Debtor's objection to the Bank's claim and the Debtor's counterclaims and request for injunctive relief against the Bank.

*Objection to Claim.*

When a creditor files a proof of claim which is properly executed and in accordance with the Bankruptcy Rules, the proof of claim constitutes prima facie evidence of the validity and amount of the claim. *In re Horizon Machinery & Engineering Corp.,* 54 B.R. 669 (N.D.Ill.1985) (citing Bankruptcy Rule 3001(f)). The pri-

ma facie validity of a claim may be rebutted, however, when a party in interest presents applicable evidence. *Id.* (citing *Wilson v. Huffman,* 712 F.2d 206, 212 (5th Cir.1983)). The ultimate burden of persuasion is vested in the claimant. *Id.* If the objecting party rebuts the prima facie validity of the proof of claim, the claimant bears the burden of persuasion to prove the validity of the claim by a preponderance of the evidence. *Id.*

The Debtor's objection to the Bank's claim is based upon an alleged lack of adequate documentation to determine the accuracy and composition of the Bank's claim, failure to account for post-petition payments, and the Bank's bad faith conduct as found in the confirmation order. This objection is not really an objection to the validity of the claim but rather an objection to the amount of the claim. This is not to say that the objection is not valid but only to clarify the issue raised by the objection, i.e., the amount of the claim. The Court finds that, based upon the allegations in the Debtor's objection to the Bank's claim and the Court's familiarity with the issues raised at the confirmation hearing, the Debtor has rebutted the presumed amount of the claim. Therefore, the Bank has the burden of proving by a preponderance the accurate amount of its claim.

Because of the circumstances surrounding the Bank's claim, i.e., the equitable subordination of the Bank's claim and transfer of the Bank's lien to the estate, and in light of the Debtor's counterclaims against the Bank, the Court will withhold judgment on this issue.[2]

## STANDARDS FOR SUMMARY JUDGMENT.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

**2.** It bears mentioning here that it would be unfair to judge the Bank's claim based upon a proof of claim filed prior to the confirmation order which substantially altered the Bank's claim. However, the Court will admonish the Bank to submit some documentation in support of its claim which clarifies the issues raised in the debtor's objection, assuming that the Bank will be entitled to payment on its claim after resolution of the Debtor's counterclaims.

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir.1986); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 983 (7th Cir.1986). On a motion for summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Shlay*, 802 F.2d at 920; *Valentine*, 802 F.2d at 983. The principle inquiry is whether the evidence presents a sufficient disagreement to require trial or whether it is so one-sided that one party must prevail as a matter of law. *Anderson.*

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. This is essentially a requirement that the moving party on a motion for summary judgment make a prima facie showing that it is entitled to summary judgment. 10A *Wright, Miller & Kane, Federal Practice & Procedure, Civil*, § 2727. Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial. If the burden of persuasion at trial would be on the moving party, the party moving for summary judgment may satisfy Rule 56's burden of production by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for the non-moving party. *See* 10A *Wright, Miller & Kane*, § 2727, pp. 130–131. Stated differently, once the Debtor has demonstrated that it is entitled to judgment, the Bank must either negate an essential element of the Debtor's claims or show that the Debtor's claims are insufficient to establish claims under the various theories raised in the Debtor's pleadings.

In addition to the foregoing requirements, Rule 12(e) of the General Rules of the United States District Court for the Northern District of Illinois adopted by General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts which they contend there is no genuine issue. Rule 12(f) requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If that statement fails to deny the facts alleged in the movant's statement, those facts will be deemed admitted. The Debtor has filed Rule 12(e) statements but the Bank has not filed a Rule 12(f) statement. Instead the Bank attacks the adequacy of the statements. Since the Debtor's Rule 12(e) statement essentially restates this Courts findings of fact in the confirmation order, it would be futile for the Bank to deny them. However, the Bank has also failed to allege that there is a genuine issue as to any fact relevant to resolution of the Debtor's motions. Instead, the Bank makes general denials and apparently rests on its pleadings.

The Debtor claims that it is entitled to summary judgment on its counter claims because the Court has already determined the factual issues in the confirmation order, which determination the Debtor claims is entitled to preclusive effect under the doctrine of *collateral estoppel*. The Bank, on the other hand, moves for dismissal of the objection to claim and counterclaims I—III on the ground that these causes of

action are barred under the doctrine of *res judicata*. As to counterclaim IV, the Bank claims that the issues raised at the confirmation hearing are different from the issues raised by the instant claims and that the supporting affidavits are inadequate. As affirmative defenses, the Bank alleges that the Debtor is estopped on the grounds of laches and election of remedies.

*Res Judicata and Collateral Estoppel.*

■ The doctrine of *res judicata* is a time-honored principle developed to assure the finality of decisions. As the United States Supreme Court noted, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (citing *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). *Res judicata* encourages reliance on judicial decisions, bars vexatious litigation and frees the courts to resolve the issues previously litigated. The doctrine prohibits the relitigation of issues actually litigated between the same parties and those which might have been litigated previously.

In this case, *res judicata* is not applicable because the confirmation hearing held in this case involved only the narrow question of whether the Bank's claim should be subordinated and did not involve the right of a Chapter 11 Debtor to object to a subordinated claim and assert counterclaims.

The Bank claims that allowing the Debtor to bring this action subsequent to the confirmation hearing undermines the principle of *res judicata* and gives the Debtor a second bite at the apple. The Bank cites *In re Air Center, Inc.,* 48 B.R. 693 (D.Okl. 1985) and *A. Musto Co. Inc. v. Satran,* 477 F.Supp. 1172 (D.Mass.1979), for the proposition that an order confirming a plan of reorganization is *res judicata* as to all questions which could have been raised pertaining to that plan. The Court disagrees and rejects the argument that these cases support the proposition that failure to interpose an objection to claim and counterclaims at a confirmation hearing bars subsequent assertion as independent claims for relief. *See Second Restatement,* Judgments §§ 13 and 19, comment a. Under relevant bankruptcy law, objections may be made and allowed after automatic allowance of a claim. *See* Advisory Committee Note to Bankruptcy Rule 3007. Indeed a claim allowed by order may be later disallowed upon reconsideration. 11 U.S.C. § 502(j). And the Bank has neither argued nor cited authority which would suggest that the compulsory counterclaim rule under Bankruptcy Rule 7013 is applicable to the counterclaims.

■ A Court may properly apply the narrow doctrine of collateral estoppel when four conditions are satisfied:

1. The issues sought to be precluded must be the same as those involved in the prior action;

2. The issues must have been actually litigated;

3. They must have been determined by valid and final judgment; and

4. The determination must have been essential to the final judgment.

*In re Wade,* 26 B.R. 477, 481–82 (Bkrtcy. N.D.Ill.1983); *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987); *County of Cook v. Midcon Corp.,* 773 F.2d 892, 898 (7th Cir.1985).

Each of the claims raised in the Debtor's counter claims focus to some extent on the Court's finding of bad faith as to the Bank's termination of the line of credit. There is no question but that the Bank's bad faith termination of the line of credit was litigated in the confirmation hearing and that a finding of bad faith was necessary for the Court's determination that the Bank's claim should be equitably subordinated. The order confirming the Debtor's Plan of Reorganization is a final order. Thus, the requirements of collateral estoppel are satisfied. The remaining question is whether the Debtor is entitled to summary judgment as to its counterclaims.

For the reasons set forth below, the Debtor's motion for summary judgment as to counterclaims I—IV is granted, except as to any determination as to actual dam-

ages, and the motion for summary judgment as to the objection to claim is denied. The measurement of damages will be determined upon a hearing.

*Count I—Breach of Duty of Good Faith.*

■ The Bank's breach of its duty of good faith constitutes a breach of contract. A breach of a duty of good faith also constitutes, as a matter of law, the separate and independent tort of wilful and wanton misconduct, which justifies an award of compensatory and punitive damages. *Kelsay v. Motorola Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 360 (1978). And, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law. *Kelsay*, 23 Ill.Dec. at 564, 384 N.E.2d at 359.

Under Illinois law, punitive damages for breach of a contract are permissible if "the cause of action is premised upon a separate and independent tort." *Kelsay v. Motorola Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 360 (1978); *Hutchinson v. Brotman–Sherman Theatres, Inc.*, 94 Ill. App.3d 1066, 1080, 50 Ill.Dec. 422, 452–53, 419 N.E.2d 530, 540–41 (1st Dist.1981); *Allabastro v. Cummins*, 90 Ill.App.3d 394, 399–400, 45 Ill.Dec. 753, 756, 413 N.E.2d 86, 89 (1st Dist.1980).

■ Wilful and wanton misconduct is conduct which constitutes "conscious and deliberate disregard for the rights or safety of others", or "an intentional disregard of a known duty necessary to the safety of the person or property of another," *Morrow v. L.A. Goldschmidt Associates, Inc.*, 126 Ill.App.3d 1089, 82 Ill.Dec. 152, 157–58, 468 N.E.2d 414, 419–20 (1st Dist.1984); *Wolinsky v. Kadison*, 114 Ill.App.3d 527, 70 Ill.Dec. 277, 284–85, 449 N.E.2d 151, 158–59 (1st Dist.1983). The Bank's conscious and deliberate decision in breaching its duty of good faith and terminating Debtor's line of credit constitutes wilful and wanton misconduct under Illinois law.

The Bank knew or should have known that its conduct would adversely affect the Debtor's financial condition, that the Bank was aware of the Debtor's condition and of the impact that termination of the line of credit would have upon the Debtor and its creditors, and that the Bank's conduct manifests a disregard for the Debtor's reorganization case.

*Count II—Fraud.*

■ Punitive damages are appropriate for fraudulent conduct. *Kelsay*, 23 Ill.Dec. at 565, 384 N.E.2d at 360; *Hutchinson*, 50 Ill.Dec. at 453, 419 N.E.2d at 541. Under Illinois law, "a misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement." *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 13 Ill. Dec. 699, 706, 371 N.E.2d 634, 641 (1977); quoting *Roth v. Roth*, 45 Ill.2d 19, 23, 256 N.E.2d 838, 840 (1970), and citing *Roda v. Berko*, 401 Ill. 335, 339–40, 81 N.E.2d 912, 915 (1948). The elements for fraud by misrepresentation are "[m]isrepresentation of an existing material fact coupled with scienter, deception and injury". *Steinberg*, 69 Ill.Dec. at 705, 371 N.E.2d at 640.

Robert Stochel, counsel and agent for the Bank, attended a creditor's meeting, fully aware of the Bank's decision to terminate the line of credit and failed to mention the Bank's decision while affirming to those present that the Court had entered the Financing Order approving the Loan and Security Agreement. This amounts to a representation that the Bank would be financing the Debtor's reorganization. Failure to disclose the Bank's decision to terminate the line of credit had the same effect as would have an affirmative representation.

Illinois courts consistently hold that "[w]here a person has a duty to speak, his failure to disclose material information is equivalent to a fraudulent concealment." *Salisbury v. Chapman Realty*, 124 Ill.App. 3d 1057, 80 Ill.Dec. 336, 337, 465 N.E.2d 127, 132 (3d Dist.1984); *Crowell v. Bilandic*, 77 Ill.App.3d 162, 32 Ill.Dec. 642, 645,

395 N.E.2d 1023, 1026 (Ill.App. 1st Dist. 1979).

### Count III—Breach of Contract.

■ Illinois' version of the Uniform Commercial Code, Ill.Rev.Stat. Ch. 26 ¶ 1–203 provides that every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement. This duty of good faith is defined as "honesty in fact with respect to the transaction in question." Ill.Rev.Stat. Ch. 26 ¶ 1–201(19).

The Court of Appeals for the Seventh Circuit is among the many courts which have imposed this contractual duty to act in good faith on banks exercising their rights under a loan or security agreement. *See U.S. v. Cain*, 736 F.2d 1195, 1198 (7th Cir.1984). This contractual duty has also been imposed on lenders by Illinois state courts. *Carrico v. Delp*, 141 Ill.App.3d 684, 95 Ill.Dec. 880, 884, 490 N.E.2d 972, 976 (4th Dist.1985).

This duty is imposed by Illinois law as a contractual obligation and a breach of the duty of good faith is a breach of contract. *See* Ill.Rev.Stat. Ch. 26 ¶ 1–203, ¶ 1–201(19); *Carrico, supra.*

Good faith in the context of termination of a lending agreement means that such termination must be in accord with reasonable expectations of the parties. *Carrico*, 95 Ill.Dec. at 884, 490 N.E.2d at 976. The Bank's termination was not in good faith as there existed no valid business reason to terminate the line of credit because the bank was fully secured, received timely payment on its debt, and had the complete cooperation of the Debtor.

### Count IV—Injunctive Relief.

■ In this counterclaim, the Debtor seeks to enjoin a state court action filed by the Bank against the Debtor's principals as guarantors of the Debtor's obligations under the various loan documents at issue. *First Bank of Whiting v. Khamalow Beard and Nathaniel Parker*, Case No. 85 L 6010, Circuit Court of Cook County, Illinois, County Department First District, Law Division. The Debtor seeks to permanently enjoin the Bank from attempting to collect on the guarantees executed by Beard and Parker; attempting to pursue any personal assets of Beard or Parker pledged, mortgaged, or otherwise given as security or collateral for funds advanced or promised to the Debtor; to release a mortgage dated September 23, 1983 and recorded January 13, 1984, Document No. LR3350987, Cook County Recorder of Deeds; and to release any and all other claims the Bank may have against Beard or Parker or their property.

A proceeding for injunctive relief under § 105(a) is an adversary proceeding governed by Part VII of the Bankruptcy Rules. Bankruptcy Rule 7001(7). Under Bankruptcy Rule 7065, Rule 65 of the Federal Rules of Civil Procedure is applicable, except that a temporary restraining order or preliminary injunction may be issued on the application of a debtor, trustee or debtor in possession without compliance with the bonding requirement of Rule 65(c). 2 *Collier on Bankruptcy*, ¶ 105.02, p. 105–7 (15th ed. 1979).

While the power may be broad under § 105, courts should be careful not to abuse it. *Id.* It does not permit the court to ignore, supersede, suspend or even misconstrue the statute itself or the rules. *Id.* Section 105 is also an authorization, as required under 28 U.S.C. § 2283, for a court of the United States to stay proceedings in a state court. *Id.*

It is well settled that a bankruptcy court has authority to provide the injunctive relief sought under the appropriate circumstances. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1986); *In re Monroe Well Service, Inc.*, 67 B.R. 746 (E.D.Pa. 1986); *In re Lahman Manufacturing Co., Inc.*, 33 B.R. 681 (D.S.D.1983). Such authority extends to grants of permanent injunctions. *In re Johns–Manville*, 68 B.R. 618 (Bkrtcy.S.D.N.Y.1986); *In re Otero Mills*, 21 B.R. 777, (Bkrtcy.N.M.), *aff'd*, 25 B.R. 1018 (D.N.M.1982).

In order for the Court to enjoin a creditor's action against a guarantor of the Debtor, the Debtor must show irreparable harm to the bankruptcy estate, strong likelihood of success on the merits and no

harm or minimal harm to other parties. *Otero Mills*, 21 B.R. at 779.

The Court is satisfied that the harm alleged herein would detrimentally affect the Debtor and make it impossible for the Debtor to consummate its plan. There is no doubt that assets of the Debtor's principals is crucial to the Debtor's ability to obtain additional financing. In fact, the personal assets of the principles were used to obtain the financing arrangement with the Bank. Any action against these assets will have a direct impact upon the bankruptcy estate.

In light of the Court's findings of fact in the confirmation order, there is a strong likelihood that the principals will prevail in the action brought against them by the Bank. In light of the Bank's bad faith termination of the loan and the surrounding circumstances, as set forth in the confirmation order, there is a strong probability that the Debtor's principle are entitled to be released from their obligations as guarantors. *See*, 72 C.J.S. §§ 118–23. The damage to the Debtor resulting from the Bank's conduct is likely to be deemed a change which alters the nature of the guarantee and results in increased risk to the guarantors. *See, Bernardi Bros. Inc. v. Great Lakes Distributing, Inc.*, 712 F.2d 1205 (7th Cir.1983); *Essex International, Inc. v. Clamage*, 440 F.2d 547 (7th Cir. 1971). Thus, there would be minimal harm to the Bank if this action is enjoined because the Bank will probably be unable to enforce the guarantees by reason of its own bad faith conduct in its dealings with the Debtor.

## CONCLUSION

Summary judgment is appropriate as to counterclaims I—IV, but not as to the objection to claim. Summary judgment is appropriate as to counterclaims I—IV because the factual issues concerning the Bank's conduct have already been determined in the court confirmation order, leaving no issue of material fact as to these claims, and the Debtor has demonstrated that it is entitled to summary judgment as a matter of law. Furthermore, the Bank

has offered as evidence nothing more than general denials and has failed to demonstrate that there is a material issue of fact as to these claims. Therefore, the Debtor is entitled to summary judgment as to these claims.

Summary judgment is not appropriate as to the objection to claim as there are issues of material fact as to this objection. First, there exists an issue as to whether the Bank would be entitled to payment on its claim upon a showing of the accurate amount of the claim after accounting for post petition payments. There is also an issue as to whether the amount of the claim includes post petition interest. Therefore, it is not clear that the Bank is not entitled to any payment on its claim, although the debtor has rebutted the presumed validity of the amount of the claim.

ACCORDINGLY, IT ORDERED that the Debtor's motions for summary judgment as to counterclaims I—IV be and are hereby granted.

IT IS FURTHER ORDERED that the Debtor's motion for summary judgment as to the objection to claim be and is hereby denied.

IT IS FURTHER ORDERED that this matter is set for hearing on March 22, 1989, at 10:00 a.m., on the objection to claim and damages.